UNITED STATES, Appellee

v

ROBERT W. SMITH, Private E–2, U. S. Army, Appellant

6 USCMA 521, 20 CMR 237

No. 6560

Decided December 9, 1955

*Captain Albert C. Malone, Jr.*, argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Jackson K. Judy* and *Lieutenant Colonel Edward Duvall.*

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case involves certain disturbing questions growing out of alleged misconduct on the part of the membership of a court-martial. The present accused, Smith, pleaded not guilty to, but —following trial by a general court— was convicted of, involuntary manslaughter, wrongful appropriation of a motor vehicle, and fleeing the scene of an accident, in violation respectively of Articles 119, 121 and 134, Uniform Code of Military Justice, 50 USC §§ 713, 715 and 728. The sentence, as modified by the convening authority and approved by a board of review in the office of The Judge Advocate General, United States Army, extends to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for three and one-half years. The accused's petition for review by this Court was granted on the issue of whether—through his questioning of the accused while the latter was testifying as a witness in his own behalf— the president of the court deprived Smith of a fair and impartial trial.

At the hearing, considerable evidence was adduced implicating the appellant in the commission of the charged offenses. He elected to take the stand, and—in the face of compelling testimony against him—attempted to establish that he had been present in his battery area during the entire evening in question, and hence was wholly uninvolved. The details of this defense of alibi were corroborated partially, but not entirely. Following the testimony of certain rebuttal witnesses, the accused resumed the stand at the request of the court and the following colloquy ensued:

**523**

"PRES: Private Smith, the court has considered your previous testimony and you have heard the testimony of other witnesses in this case. It appears evident to the court that you were at the scene of the accident and it appears to the court that you may be trying to cover up and get . . . off this charge in the event that the court believed your testimony, but since the Court is convinced that you . . . were at the scene of the accident, a question does remain as to which one of you actually drove the vehicle . . .

"A. I wasn't there, sir."

Subsequent to the testimony of additional rebuttal witnesses, the accused was once more recalled by the court and the following questions put to him:

"PRES: Private Smith, you have heard the witnesses . . . [testify] that you were there with them . . . .

"A. Yes, sir.

"PRES: You have heard the testimony that establishes that you had departed from the area of your field artillery battery . . . ; you have just heard testimony . . . that you were present at the KMAG Club on the evening of the 25th of April. The court can only conclude that you were present with these other men . . . Do you understand that the court believes that you were there at the Club that night?

"A. Yes, sir. I do.

"PRES: We have only your testimony . . . ; that testimony is uncorroborated . . . the court believes that you were at the KMAG Club on the evening of the 25 of April 1954. The only question in the mind of the court is how did you get home from the KMAG Club? Were you a passenger in the vehicle or were you driving the vehicle?

"ACCUSED: I didn't leave the area, sir."

Further questions were put by the president, or perhaps by another member of the court—the record is not entirely clear—which, when considered in the light of those which preceded, should have dispelled all doubt in the minds of those present that the senior member of the court, at the very least, had not only arrived at a firm conclusion that the accused was guilty as charged, but believed that he had committed perjury as well; this despite the fact that the hearing had not been terminated, and the court-martial was at the time uninstructed. No objection was taken by the defense to this line of questioning, nor does the record reflect expressions of disapproval directed against the president's conduct in this particular either by the law officer or by other members of the court. Following the final exchange between the president and the accused, the court was instructed by the law officer and retired —returning in exactly five minutes with findings of guilty as charged. The accused now urges on appeal that the president's public prejudgment effectively denied to him his right to a fair and impartial trial.

II

The Government bases its answer to this claim of error on two principal grounds—the first springing from the provisions of paragraph 149b of the current Manual for Courts-Martial, and the second from a line of decisions by this Court.

Initially, it is claimed that the activities of the president were quite without error, and came to no more than a commendable effort to ascertain the truth. This astonishing conclusion is bottomed on the provisions of the Manual for Courts-Martial, United States, 1951, paragraph 149b, which authorizes the questioning of witnesses by a court-martial or its several members. This grant of authority is undeniably broadened in subparagraph (3) of the cited provision, which establishes the following as a guidepost for the questioning of the accused as a witness.

"In questioning an accused the court and its members must confine themselves to questions which would be permissible on cross-examination of the accused by the prosecution."

On this basis, the Government conceives an entire absence of error, since it is considered that the questions un-

der scrutiny would have been unobjectionable had they been asked by the trial counsel during cross-examination of the accused. To us, however, it is beyond dispute that the ▉▉ questioning by the president was improper. It is manifest that the framers of the Manual expressed no slightest intention of permitting such dubious juristic conduct by means of their simple provision for questions by a court-martial "which would be permissible on cross-examination of the accused by the prosecution." Manual, supra, 149b(3).

We recognize, of course, that not every act of misconduct by a court member justifies the reversal of ▉▉ a conviction. See United States v Adamiak, 4 US CMA 412, 15 CMR 412. For example, state court authority exists to the effect that a juror's expression of opinion as to the guilt of the accused—although the observation is made prior to deliberation by the fact-finders—does not inevitably require the setting aside of a conviction. State v Robidou, 20 ND 518, 128 NW 1124. However, in United States v Carver, 6 USCMA 258, 19 CMR 384, we noted that a court member "is not permitted to take sides and become an advocate for either party," and that "[o]nce he openly leaves a nonpartisan role, he is subject to challenge for cause." We must therefore consider whether the conduct of the president in presuming to speak for the court, together with the possible assistance of at least one other court member plus the tacit approval given to the president's conduct by the court-martial itself, establishes that one or more of the fact-finders had become subject to challenge on this ground.

We experience no difficulty in answering affirmatively the question posed in the previous paragraph. ▉▉ After both parties had concluded the presentation of evidence, the court-martial recalled the accused to the stand, subjected him to abusive interrogation, and insinuated that he had perjured himself. The language used by the president is particularly open to challenge in that he purported to represent the court-martial, not in the impartial role of a jury foreman, but virtually as an assistant prosecutor. We are, therefore, sure that the members of this court-martial deserted their customary and proper role and joined the ranks of partisan advocates.

Accepting the prospect that the challenged interrogation might conceivably be regarded with a ▉▉ jaundiced eye on appeal, the Government maintains that, assuming *arguendo* the presence of error, nevertheless this accused may not now be heard to complain, since he had failed to seek a seasonable remedy either by means of an objection to the several questions themselves, or by a challenge directed at least against the principal questioner as a member of the court-martial. In support of this claimed waiver, the Government cites the following of our opinions, among others: United States v Turner, 5 US CMA 445, 18 CMR 69; United States v Vanderpool, 4 USCMA 561, 16 CMR 135; United States v Fisher, 4 USCMA 152, 15 CMR 152; United States v Thomas, 3 USCMA 161, 11 CMR 161.

In this connection, State v Sickles, 220 Mo App 290, 286 SW 432, appears to us to present a situation analogous to that found in the instant case. In Sickles, the accused was being tried for the possession of an alcoholic beverage in violation of then-existing Missouri prohibition legislation. Having taken the stand in his own behalf, he was questioned—following appropriate interrogation by counsel—by a juror, who had requested and received permission from the trial judge to do so. These questions soon became "of such a character as to indicate that the juror thought defendant guilty." No objection was made, however, and when, on appeal, the accused sought reversal of the conviction—claiming, *inter alia,* that the juror's questions denied him a fair and impartial trial—the State contended that his failure to object at the trial served as a waiver of that complaint on appeal. The Court of Appeals disagreed and, in reversing the conviction, held that, while failure to object to questions propounded by opposing counsel or the trial judge will be deemed

to result in waiver of the objection on appeal, this rule must not be applied in the case of those asked of a witness by a juror—a member of the tribunal's fact-finding agency. In so holding, the court said:

"... Must counsel take the risk of offending a juror and prejudicing him against counsel's case in order to save the point for review? Suppose he makes an objection and the court sustains it. Will not the juror who asked the question be likely to be offended? The counsel is thus put to the choice of offending a juror by an objection or letting incompetent testimony go in without objection. ... If he objects to the question and by so doing offends the juror and he loses his case he has no remedy."

There can be no doubt that, in the instant case, the conduct of the court-martial's senior member cried out for drastic remedial action on the part of *someone*. But the law officer had taken no sort of action—and what was defense counsel to do? Shall we require that the latter "take the risk of offending a ... [member of the court] and prejudicing him against counsel's case in order to save the point for review?" It cannot safely be denied that an objection to the questions put by the president here might have served no other purpose than that of further antagonizing against the accused one or more of the fact-finders.[1]

And—on the dubious assumption that the president's misconduct reduced to no more than the disclosure █ of probable bias on the part of a single member of the court—it would appear that a challenge for cause directed against him would have constituted a vain and nugatory gesture, and one reaching a new low in inutility. It must be remembered that such challenges are passed on in military trials not by the law officer—the tribunal's "judge"—but instead by the remaining members of the court-martial. See United States v Adamiak, 4 USCMA 412, 15 CMR 412; United States v Deain, 5 USCMA 44, 17 CMR 44. And here the president, in his expressions of prejudgment, had presumed to speak for all members of the court—whose masterful inactivity in the face of their "foreman's" declaration suggests powerfully that he knew whereof he spoke.

Indeed, as we see it, no genuinely useful course was open to the accused's lawyer, save to ask the law █ officer for a mistrial. However, we cannot charge him with omission here, because at the time of the hearing this remedy was virtually unknown to military criminal law administrators—this for the reason that the comparatively recent decision of this Court clarifying its use as a valid procedural device in military cases had not been handed down. United States v Stringer, 5 USCMA 122, 17 CMR 122; cf. United States v Conway [NCM 228]

[1] It has been suggested that the junior member of the Judge Advocate General's Corps who served as the accused's assigned counsel at the trial merits the condemnation of this Court for his failure to object in timely fashion to the reprehensible conduct of the colonel who presided over the court-martial—and perhaps that of other members of the body as well. While we have no wish to condone any sort of defensive omissions on the part of the lieutenant who represented Smith, we doubt that the present case constitutes a particularly appropriate vehicle for fruitful instruction in the responsibilities of assigned defense counsel.

As will be evident from later portions of this opinion, the administration of the entire proceeding appears to have been unhappily loose, and it seems clear that things got out of hand with a vengeance shortly before the court closed to deliberate on findings. It follows that, if we were to see present point in an attack on the competence of the trial's professional personnel, we would unhesitatingly center on the law officer. Certainly there is no basis for suggestion that the accused's lawyer meant slyly to omit objection at the trial in order that he might rely on the court-martial's improprieties for reversal on appeal.

All in all, we have preferred to deal primarily with the *situation* with which we are confronted, rather than with the question of responsibility for its existence.

11 CMR 625. It must be obvious, therefore, that this accused cannot be held to have foresworn by his silence that which he may not have known was available for his protection. Accordingly, it must be concluded that Smith had forfeited none of his appellate rights in this particular.

### III

In the last analysis, however, the complaint raised by this accused—when viewed in true perspective, and against a backdrop of the entire record of trial—pierces the more technical approach taken advisedly by us thus far in the course of this opinion, and strikes directly at issues basic to the standard of military justice commanded by the Code and the Manual.

Here the president of the court-martial—speaking officially as such—had recalled the accused to the stand during his trial, and had informed him, in effect, that his testimonial story was wholly disbelieved by *the members of the tribunal,* the fact-finders in his case. What mandate the president bore in the making of this unequivocal assertion is undisclosed by the record. Certainly, it is not reported that the court had closed in advance of instructions, and had formally determined the issue of the appellant's guilt or innocence—and we do not at all believe this course to have been followed. However, had there been a casual exchange of views on the bench by written note or otherwise? We do not know. Or did the president merely infer that he was aware of the temper of his associates and therefore undertake to speak for them in the expectation that he would be gainsaid if in error? Again we cannot speak with assurance. What we do know, however, is that the Army colonel, who served as the senior member of the court-martial and necessarily as its presiding officer, purported during the course of the trial to speak for his fellows on a critical issue in the case—and well within their physical presence. There is no suggestion that they did not hear him—yet no one of them chose to reject his account of their views. Nor did the law officer interpose any sort of direction or comment. And, as we have seen—

and for sound reason—neither did the assigned defense counsel.

Perhaps, in fact, the court's president possessed no authority to represent his associates within its membership. If this is true, then we suppose he spoke merely for himself, and we may find no more than a probably biased "juror"—albeit a senior and important one in this military setting. But, on the other hand, perhaps he was—and knew that he was—expressing the firm appraisal of his colleagues, and that all had determined that the accused had, in truth, been present in the fatal vehicle at the crucial moment, and probably at its controls. Against the present background, and in the described posture of the situation before us, we simply cannot in the exercise of our judicial responsibility conclude—assume, in fact—that the colonel expressed only his personal estimate of the truthfulness of the accused's account of his whereabouts on the evening of the crime. And if we not do this, then we are faced with a picture in which the members of a court-martial—presumably all, for we cannot with assurance infer less—had reached their determination of a basic issue in a case before them, and had expressed it in open court, substantially before the case had been closed, and prior to having received the instructions of the law officer.

It is possible that the foregoing analysis has been presented with, at once, a specificity, a vigor, and an assurance which are unnecessary to the present decision—perhaps unwarranted by the bare bones of the problem before us. However, this is really a matter of small moment—for it is undeniable that one is left with the distinct and inescapable impression that, in effect, the issue of the guilt or innocence of the appellant here had been resolved considerably in advance of the proper time, and hardly in the proper manner. And, for whatever it is worth, this impression is bolstered somewhat by a consideration of the trifling period of time involved in the court's actual deliberations—if, indeed, they may be characterized as such within the original meaning of the term.

**527**

It is recognized, of course, that the conduct of a trial by court-martial—being a human enterprise—can scarcely be expected to achieve perfection in all of its aspects. Thus, this Court has at all times sought to avoid doctrinaire attitudes, and to concern itself principally with substantial rights and basic protections. At the same time, we are unwilling to depart to the extent demanded for the support of the present case from "that thoroughgoing impartiality that is the ideal" postulated by the Supreme Court in Glasser v United States, 315 US 60, 83, 62 S Ct 457, 470, 86 L ed 680, 706. It is certainly to be supposed that each member of a court-martial will not only conduct himself so as to give rise to no inference of favor toward either the prosecution or defense, but will also guard his mind against the formation of an opinion on ultimate issues until *all* of the available material—evidentiary and instructional—has been presented for his consideration. Here it is clear that at least the senior member did neither. Conversely, he did one of two equally unfortunate things. Either he spoke for himself *and* his fellow court members in prejudging a case before its termination or, in the alternative, he posed a situation impliedly demanding obedience on the part of his juniors to his personal wishes and predilections. On the latter assumption—and from the record—we have no choice but to assume that he obtained it forthwith. At the least, there is too great a danger that this is true to permit of comfort in the premises.

In sum—and whatever exactly one's analysis and estimate of the present problem—it seems certain that the climate thus created was in no way conducive to that calm, careful and dispassionate consideration of the facts and issues of a case which is necessary for responsible and valid findings. Indeed, it appears highly improbable to us that any accused person under these facts could have been afforded this desideratum—patently an indispensable prerequisite to the sort of court-martial trial contemplated by the Code and the Manual. Thus, whether the case

be viewed through the spectacles of military due process, general prejudice or, more generally but equally soundly, the manifest failure of the tribunal to accord the accused a fair and orderly trial, it is clear that the conviction before us cannot stand.

IV

It follows that the decision of the board of review must be, and hereby is, reversed. A rehearing is ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

Were it not for the attempt to excuse defense counsel's failure to grapple with the situation in the trial forum, I would not record my reservations. However, I believe it unwise for this Court to suggest that an objection or challenge by defense counsel was not required, because he might have prejudiced the court-martial against his client. For the purposes of this case, the best answer to that contention is that the president had spoken forcibly and without equivocation to the effect that he and the other court-martial members were so antagonistic to the accused that conviction was bound to follow. A timely objection could not have worsened the cause of the accused and it might have helped. Of course, the law officer should have exercised some control over the proceedings but that does not discharge the defense counsel from his primary duty to protect his client. Both were derelict in the performance of their assigned tasks. Here the accused was openly accused of being a perjurer and guilty of at least two offenses by one or more court members who were supposed to be impartial and unbiased, and the majority find the "do nothing" role of his advocate an excusable practice.

In my view, the principal opinion overlooks the fact that defense counsel has some duty to keep error from creeping in, and the further duty to have it corrected or removed at the earliest

528

possible time, if it does find its way into a hearing. Every challenge may offend the person against whom it is directed, and perhaps other members of the court-martial; but if grounds for disqualification become apparent during the course of a trial, the challenge should be exercised regardless of nettled sensibilities. This record bespeaks a shocking disregard of the duties of one who is to weigh the guilt or innocence of an accused person, yet who knows whether an objection timely made might not have changed the course of the inquiry. To say the least, proper representation would have made it possible for us to identify the offenders and pass intelligently upon the mental processes of those members of the court-martial who had apparently joined hands with the prosecution. As the case now stands, this Court corrects the error without an objection and it could have accomplished the same result even had someone's feelings been hurt by counsel preserving the error properly. If the latter course had been pursued, it would have been a much easier and more satisfactory task for us, because we would know full well that defending counsel had fought to prevent the irregularity from occurring. While this record speaks to the contrary, the rule announced in the majority opinion makes legal skullduggery possible and offers us some difficulty in separating trickery from skill or ignorance. Surely if we wish to encourage an ever higher standard of proficiency in practice before military tribunals, we should speak out against this sort of inaction by defense counsel.

Even were I to accept the philosophy —which I do not—that counsel should be timid ere they offend a court member, this case is a poor vehicle to support the rule. The trial had not been long under way when it became clear that certain court-martial members were determined to fix responsibility for this homicide upon someone, and in short order. First of all, they directed their misguided efforts on a prosecution witness, and openly suggested he was testifying falsely on what turned out to be a collateral matter. They were,

however, quite willing to accept his version of the tragic accident. When the accused became a witness in his own behalf, they shifted their line of attack and it became crystal clear that some of the questioners were anti-accused. That situation was bad, but it was made worse by defense counsel, who twice permitted his client to be recalled to the witness stand and badgered by court members who very definitely charged him with lying. The law officer did have the foresight to advise defense counsel that the accused need not return to the stand, but even that advice was disregarded. I doubt that feelings would have been ruffled had defense counsel seized upon that proffered right.

Anyone reading this record would characterize the proceedings as a trial by ordeal, and I am at a loss to understand why defense counsel remained so unaware of the unjudicial attitude of court members. The author Judge discloses adequate grounds for error and prejudice, but to those I add the *modus operandi* of the court. After both sides had rested, the court recalled the accused. He was then challenged with the testimony of all witnesses, accused of falsifying when he had testified for himself, and given a choice of admitting perjury or of being convicted. When he protested his innocence, he was excused from the chair, and a witness was called to dispute his protestations of freedom from sin. He was then recalled by the court, his attention was directed to the newly produced evidence, he was informed that he was falsifying, and finally he was informed that the court would be willing to listen if he would change his story. This is the final colloquy, and it establishes quite conclusively why the court-martial required only five minutes to find the accused guilty of involuntary manslaughter, an offense which could not be affirmed by the convening authority because of insufficiency of the evidence:

"Q. These are not the issue, Private Smith. The issue is were you at the KMAG Club or were you not; were you in the vehicle or were you

**529**

not; were you driving the vehicle or were you not?

A. No, sir.

"Q. All the circumstantial evidence indicates you were driving the vehicle, and there is no object in persisting in tell [sic] the court that you were not at the KMAG Club. If you want to tell the court the truth, the court will be glad to listen? Do you have anything to say?

A. No, sir."

We have never invoked the doctrine of waiver when to do so would work a manifest miscarriage of justice. United States v Fisher, 4 USCMA 152, 15 CMR 152; United States v Parker, 6 USCMA 75, 19 CMR 201. A fundamental guarantee of military law is that an accused who pleads not guilty has a right to a hearing before impartial and unbiased fact-finders. While their opinion is molded as the drama unfolds, they should not prejudge an accused prior to the time when all of the evidence has been presented and they have been instructed on the law. Here the record does not establish how many court members participated in the offensive questioning, but from the number of questions asked and the posture of the record, it is reasonable to suppose that more than just the president chose to hammer away at the accused until his defense collapsed. Even if I be wrong as to number of members involved, at least the president of the court transgressed, and because of his rank and prestige, he may have exerted considerable influence on other members. As to him, it appears certain that he changed his cloak of a juror for the sword of a prosecutor. He somehow or other became obsessed with the idea that he must establish guilt. His questions indicated the zeal of an advocate not the reflection of one who is to judge. The consistency of the accused seemed to rankle him, and his comments show the utter futility of giving instructions and requiring the members to deliberate.

To escape the rule that a waiver will not be imposed if it results in a miscarriage of justice, the Government advance the argument that the error, if any, was harmless because the evidence of guilt is compelling. I do not so find it. Trial counsel apologetically announced that some of the Government witnesses could not be held up as paragons of honesty. Found in his closing remarks is a statement that their testimony could be characterized as "real shaky." That comment, of necessity, included the witness Beaulieu, who was the chief witness for the prosecution. However, it is not necessary to weigh the credibility of witnesses or to reconcile the many conflicting statements found in this record. It is sufficient for this point merely to say this: The issue of importance was the identity of the driver of the vehicle. If prosecution witness Beaulieu was to be believed, the accused was the driver of the truck. If the accused was to be believed, he was not present at the time of the collision. If both were in the truck, a disinterested Korean witness placed Beaulieu at the steering wheel and the accused in the passenger's seat immediately after the collision. His testimony argues strongly against Beaulieu and in favor of the accused. No one else testified on the crucial issue and that factual situation does not compel a finding of guilt by reasonable men.