UNITED STATES, Appellee

v

PAUL H. BLANKENSHIP, Airman Third Class,
U. S. Air Force, Appellant

7 USCMA 328, 22 CMR 118

No. 8026

Decided August 31, 1956

*Major Edmund B. Sigman* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Major John M. Rankin* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis P. Murray* and *Lieutenant Colonel Emanuel Lewis.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial in Japan convicted the accused of premeditated murder (Charge I) and assault with the intent to commit murder (Charge II), in violation of Articles 118 and 134,

**329**

Uniform Code of Military Justice, 50 USC § 712 and § 728, respectively. It adjudged a sentence which includes confinement at hard labor for life. Intermediate appellate authorities affirmed. We granted review.

At the end of the working day on January 20, 1955, Sergeants Thaxton and Argyle engaged in some drinking at the NCO Club at Itami Air Base. Later, they started to go to the base gymnasium to see a basketball game. They stopped at Mess Hall No. 2 for something to eat. Unable to obtain anything because it was past the regular dining hour, they sat in the office. Argyle produced a bottle of whiskey, and he and Thaxton had a drink. Before they finished, the accused came in. He had been preparing the next day's meal at Mess No. 1 and had come to chat with the night crew at No. 2. He also had been drinking. Offered a drink, he accepted. After some conversation, Thaxton remarked that he had not had any dinner. The accused invited him and Argyle to Mess No. 1. They accepted the invitation.

For several hours the three men were at Mess No. 1. They had more drinks and engaged in a generally friendly conversation. At one point, the accused sharpened a hunting knife for Argyle. After a while, Thaxton took to looking at a newspaper and was unaware of the activities of the others. According to a written pretrial statement of the accused, which was admitted in evidence, he and Argyle began to argue over a geopolitical issue. He said that Argyle "was angry at me and I was angry at him." Thaxton interrupted the argument by asking for coffee. The accused started to leave the office to "check on the coffee." Sergeant Argyle blocked the doorway. The accused "gave him a pretty hard shove," and told him to get out of the way. Argyle fell back into a chair. The accused walked into the kitchen. Argyle pulled out his hunting knife and went after him.

The accused saw Argyle coming. He told him to put "that damn knife away." But holding it down near his stomach, and moving "the . . . point just

**330**

a little," Argyle continued his advance toward the accused. The accused stepped back, pulled his belt from his trouser loops, and wrapped it around his right hand. Argyle moved forward. He slashed at the accused and missed. The accused countered with "a good solid blow" with the belt buckle. The blow hit Argyle around the forehead. He staggered back a step and then fell to the floor. He made no "noise or movement." The accused jumped on him; he grabbed Argyle's knife with his left hand, switched it to his right hand, and "stuck . . . [it] into the S/Sgts back about the middle of his shoulder blades." At that point, the accused blacked out. Medical testimony supports him in that contention. However, Sergeant Thaxton was able to testify to what happened afterwards.

Thaxton testified that he looked up from his reading and saw the accused in the kitchen over Argyle's body "twisting his right hand as if he was boring something into him." Other testimony shows that Argyle was found in a pool of blood. He was dead. There were sixty-nine stab wounds in his head and body. Death was attributed to loss of blood resulting from multiple stab wounds. The original medical diagnosis included a "probable head injury" as a contributing cause of death. An autopsy report showed a fracture of the skull. However, Captain E. S. Murphy, an Army pathologist who did the microscopic sections for Argyle's autopsy, testified that the skull fracture resulted from a puncturing wound, and not "by just hitting the floor," or a blow from the belt buckle.

When the accused left Argyle, he approached the office with a knife in his right hand. He told Thaxton that he was "next." Thaxton picked up the desk telephone and dialed the operator, but the accused cut the wire. After some maneuvering, the accused swung at Thaxton with an "object" in his left hand and struck him over the eye. Thaxton grabbed the accused's right hand, smashed his knee against the accused's right wrist, and grabbed the knife from his hand. He backed out of the office, but the accused followed. The belt was again wrapped around

his right hand. Thaxton kept "yelling for help." The attention of some passers-by was attracted to the mess hall. Staff Sergeant Fricks, who was in charge of Mess Hall No. 2, was called. He and some others succeeded in gaining entry into Mess Hall No. 1. When the new arrivals noticed Sergeant Argyle's body, the accused remarked: "You needn't bother with him he wont get up." Shortly afterward, the accused and Thaxton were taken into custody by Air Police.

In the mid-afternoon of the next day, after full warning of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, the accused gave an oral statement to Office of Special Investigations agents. In it, he related the events of the tragic evening until the time of his blackout. The following morning, after additional warning of his Article 31 rights, he dictated, swore to, and signed a written statement, which was substantially the same as his previous oral account.

Called as a defense witness, Major Green, an Army psychiatrist, testified that he examined the accused on two occasions (the dates were later established as February 10 and 16). On the basis of his examination, Dr. Green concluded that the accused was suffering from amnesia in regard to the "period following the administration of the first wound with the knife until he was being restrained by another man." The amnesia was brought on by the accused's ingestion of alcohol and his emotional stress.

Trial counsel attempted to examine Dr. Green as to the accused's responsibility. Defense counsel objected on the ground that the inquiry was outside the scope of the direct examination. As a result, Major Green was made a prosecution witness. Thereafter, he testified that, in his opinion, at the time of the acts charged, the accused could distinguish right from wrong, and could adhere to the right; and he could now cooperate intelligently in his own defense. Dr. Green also said that the accused's amnesic state meant only that he could not remember events in the past, but it did not affect his capacity to know what he was doing during the commission of the offenses. Questioned by Colonel Todd, one of the members of the court, Dr. Green enumerated several reasons for his conclusion that the accused was suffering from amnesia. Among these was the fact that "there seemed to be no—what we call—secondary gain, no very practical reason for him to allege this particular period of amnesia if it were not true." Here, the following exchange between Colonel Todd and Dr. Green took place:

"Q Do you know what Airman Blankenship is sitting at that table for?
A Yes, sir.

Q What is he sitting there for?
A Premeditated murder.

Q He is charged with that offense?
A That is right.

Q And you say you can't see any particular gain?
A For this particular period. I said if he were to be malingering this particular amnesia for the purpose of gain, he would stand to gain much more by having it start five minutes earlier."

After both sides had rested, the law officer gave the court instructions on the elements of the offenses and other legal principles which it would need in its deliberations on the findings. The court then retired to deliberate on the findings.

Three hours later the court reopened. The President requested the law officer to repeat his instructions on the elements of the offenses. When the request had been complied with, Colonel Todd asked for a rereading of Major Green's testimony.

Major Green was recalled as a witness. Colonel Todd initiated his examination and elicited a statement that, in his opinion, the accused was able to premeditate and to form a specific intent while "in the heat of a sudden passion." Of particular importance to the issues before us is the following colloquy:

"Q Now what sort of things, if you can expose the secrets of your

trade—what sort of things led you to that conclusion?

A In this case I inquired specifically of the defendant in the course of my examination as to his intentions. Does the court wish that I repeat the conversation or simply . . .

Q What did the defendant say to you when you were questioning him on this point?

A I asked the defendant whether it was his intention when he seized the knife to kill the victim . . .

LO: Just a moment, is there any objection by the defense?

COL TODD:

Q I'll ask another question. If you answer that question would you be violating the confidences which you have as a psychiatrist, with this man?

A Not in this case, sir, because before examining this man I made it very clear to him whatever he said would be a matter of record and I would testify upon it.

Q And did he indicate that he understood that?

A Yes, sir.

Q Were there any witnesses to that?

A No, sir.

(The defense counsel and assistant defense counsel engaged in a prolonged consultation.)

LO: Is there any objection by the defense as to the witness relating the conversation with the accused?

CAPT LAMB: Mr. Law Officer, may I ask a question?

LO: Just a moment. This is a matter to be determined by the defense and not by you court members. I prefer you withhold the question.

COL TODD: Would defense counsel like a short recess?

LO: Apparently that might be a good idea. How long a recess would defense prefer, if any?

COL TODD: Major Summers, would you like a short recess?

DC: Just a second, there is a consultation going on here at counsel table.

DC: We'll have to object to that question.

LO: I'll have to sustain the objection."

Other members of the court also questioned Dr. Green. Eventually, the court recessed for the day. It reconvened the next morning, and Major Green resumed the witness stand. Colonel Todd began the proceedings with a long statement. Abstracted, it reads as follows:

"COL TODD: Mr. Law Officer, this is the most serious case that in my military service I have ever sat upon. Given my own free choice, I would not be here. Having been placed on orders, I conceive it may duty to do the best job I can to determine whether Airman Blankenship is guilty of the offense with which he has been charged, or of some offense of a lesser degree. During the course of this trial much testimony has been admitted into evidence, some without objection, and some over objection, which dealt with what Airman Blankenship told someone. . . . This testimony has in general the common denominator that Airman Blankenship was talking to the person giving testimony in someone else's presence, . . . I am constrained to observe that Technical Sergeant Thaxton also testified as to what Airman Blankenship told him. And to my knowledge there was no one else present who is now capable of repeating what was said, except the accused who has elected to remain silent. . . . When Doctor Green was asked what Airman Blankenship told him with regard to his intentions it seemed to me that after some thought you almost implored the defense counsel to raise an objection. . . . I understand that the rulings of the law officer are final and binding upon this court, nevertheless, this matter is so grave that I must ask you—am I correct in concluding that as a matter of law it is not permissible to permit Doctor

Green to relate to the court the substance of the conversations that he had with Airman Blankenship, and to tell the court what Airman Blankenship said?"

As a result of Colonel Todd's remarks, the law officer explained the basis for his ruling excluding the statements made by the accused to Major Green. He said that his ruling was intended to "prevent the consideration by the court of evidence which might thereafter prove to be inadmissible. At the time the objection was sustained no showing of voluntariness had been made. Since that time there has been some showing of compliance with Article 31, Uniform Code of Military Justice. There has been no further attempt since that time, however, to introduce the conversation into evidence. At this time, the law officer would like to question Major Green."

A defense objection to testimony as to the accused's statements to Dr. Green was overruled. Defense counsel then examined Dr. Green on his opinion as to the accused's ability to adhere to the right. The doctor stated that on the basis of his examination, which included the statements made to him by the accused, he believed that, while the accused was not in complete control of his mental faculties when he committed the acts charged, he could still entertain a specific intent and premeditate.

The first question for our consideration is whether Colonel Todd's conduct and statements deprived the accused of a fair trial. In military law, a court member has a right to question a witness. United States v Sears, 6 USCMA 661, 20 CMR 377; United States v Smith, 6 USCMA 521, 20 CMR 237. He can also request that a witness' testimony be reread, or that the witness himself be recalled and reexamined. United States v Parker, 7 USCMA 182, 21 CMR 308. In the latter instance, the request can be made even after the court has for a time deliberated upon the findings. United States v Parker, supra. When exercising these rights, however, a court member cannot become an advocate or a partisan for either side. If he does, he is "no longer competent to serve." United States v Sears, supra, page 665.

Here, Colonel Todd questioned every person who appeared as a witness. Some of his questions were pertinent; others were either frivolous or evinced a misunderstanding of the requirements of relevancy. However, the number and the general relevancy of Colonel Todd's questions need not give us pause. The crux of our problem is whether he judged the accused according to the evidence and without bias or prejudice.

As we read the record, we are thoroughly convinced of the truth of Colonel Todd's statement that he conceived it to be his "duty to do the best job . . . [he could] to determine whether Airman Blankenship is guilty of the offense . . . charged, or of some offense of a lesser degree." Apparently, he had ruled out the possibility of the accused's innocence. And in that decision it is also apparent that he had departed from the narrow strictures of impartiality into the broad arena of partisan advocacy. Time and time again the questions he asked the witnesses were those of a person dedicated to a chosen end. Thus, in examining a defense witness who had testified to the victim's reputation for quarrelsomeness and violence, he asked such scornful questions as: "Did Sergeant Argyle pay his bills promptly?" "Did he beat small children and dogs?" "Did he ever go AWOL?" His sarcasm became especially noticeable when he attempted to discredit Dr. Green's testimony to the effect that the accused's amnesia was genuine. The questions that he put to Dr. Green clearly show that he was "obsessed with the idea that he must establish guilt." United States v Smith, supra, page 530, concurring opinion, Judge Latimer. He professed to abide by the law officer's rulings, but he was evidently grossly dissatisfied when, as he described it, the law officer "implored" defense counsel to object to testimony regarding the accused's statements to Dr. Green.

**333**

We feel sure that Colonel Todd entered upon his duties as a court member with a firm conviction to hear the evidence impartially and to render a just verdict. Unfortunately, his zeal to do "the best job" he could drove him to the point where a reasonable person reading merely the cold pages of the record would be forced to the conclusion "that . . . [he] departed from his character as an unbiased appraiser of facts to become a champion" for the prosecution (United States v Carver, 6 USCMA 258, 265, 19 CMR 384), even to the extent of commenting on the accused's silence. We conclude, therefore, that Colonel Todd's conduct casts substantial doubt on the fairness of the trial. And, under the circumstances of this case, there was no waiver because defense counsel did not challenge Colonel Todd for cause. United States v Smith, supra.

In view of our ruling in connection with Colonel Todd's conduct, we need not consider the other issue upon which we granted review. The findings of guilty and the sentence are set aside, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge Ferguson concurs.

Latimer, Judge (concurring):

I concur.

I concur outright with the views expressed by the Chief Judge, but, because I believe law officers  should be advised that they may regulate the right of court-martial members actively to participate in questioning witnesses, I believe it advisable to express my views on that subject. Apparently some court members, mostly those of higher rank, believe that their oath faithfully and impartially to try the accused casts them in the role of assistant counsel, and, as a result, they abuse the privilege which has been extended to them. Paragraph 54b of the Manual for Courts-Martial, United States, 1951, provides:

"*Responsibility of the court.*—The court is not obliged to content itself with the evidence adduced by the parties. When such evidence appears to be insufficient for a proper determination of the matter before it, or when not satisfied that it has received all available admissible evidence on an issue before it, the court may take appropriate action with a view to obtaining available additional evidence. The court may, for instance, require the trial counsel to recall a witness, to summon new witnesses, or to make an investigation or inquiry along certain lines with a view to discovery and producing additional evidence."

I do not interpret this provision to permit members of the court-martial to become trial attorneys for either the Government or the defense, but I do find some other authority for what I shall designate as limited authority to examine witnesses. Paragraph 54a of the Manual states:

". . . The order of examining each witness is usually direct examination, cross-examination, redirect examination, recross-examination, and examination by the court. In a general court-martial, the examination by the court is ordinarily conducted by the law officer; thereafter, if necessary, members of the court may ask questions of the witness."

It is to be noted that the provision last above-quoted anticipates that the law officer will carry the burden for the court and that, if necessary, members of the court may ask questions. Someone must determine the necessity and propriety of further questioning by members and that duty falls on the law officer. That such is his responsibility is further borne out by Appendix 8a, Guide—Trial Procedure, Manual, supra, page 511, which provides that any member wishing to question a witness must first secure the permission of the law officer. There are a number of reasons why members should not be unleashed to carry on extensive examination of witnesses, and one can be found in the language of subparagraph 54c of the Manual, which states:

"*Exclusion of improper evidence.*— When proffered evidence would be

excluded on objection, the court may in its discretion bring the matter to the attention of any party entitled, but failing, to object to its admission. Such action is particularly important when improper questions are asked by a member of the court, or when improper testimony is elicited by questions asked by a member of the court—the reason for this being the natural hesitancy of the parties to object to a question asked by a member of the court and the weight likely to be given to testimony elicited through questions by the court. In the interest of justice, a court may always of its own motion exclude inadmissible evidence."

A second reason for restricting members to narrow limits in their examination is that when a court-martial member sets out on a course of conduct which consists of persistently examining witnesses to establish his theory of the case, he will, intentionally or otherwise, cause other members of the court to give undue weight to his hypothesis. Moreover, when he seeks by his examination to destroy the credibility of witnesses, he influences other court members to join in the sport. Fair trials do not flourish in that climate, for some members are influenced by the expertise of a senior member of the court, and they then seek to flex their mental ability to trap witnesses. Occasionally a member will rebel at a senior's interference, but usually the net result is a battle by the accused against the Government and individual court members. This case is an example.

As stated by the Chief Judge, Colonel Todd examined or cross-examined every witness. His efforts brought out testimony favorable to the prosecution and cast doubt on the credibility of witnesses who sought to aid the accused. He performed as a meddling partisan and, as could be expected, his conduct was infectious, for ere the case had passed the early stages, he was abetted and assisted by other members of the court. A cursory check of the record shows that on at least forty occasions other members joined in the examination and cross-examination of witnesses.

Colonel Morneau, the president of the court, ran a close second to Colonel Todd as substitute counsel, for he took it upon himself to cross-examine witnesses on at least twenty occasions. The pattern of the trial literally followed the rule of mass participation, for invariably after counsel and the law officer had completed their tasks, Colonel Todd, et al, joined the cast of lawyers. I doubt that I have ever reviewed a record in which court members sought so diligently to assist counsel in the presentation of their case.

Counsel for the Government in their brief select and call our attention to fourteen instances when Colonel Todd questioned the witnesses. It is suggested by them that the purpose of the questions was to fix the credibility of the witnesses. Assuming, arguendo, that that was the true reason, I wonder why that duty should be assumed by a member of the court. Counsel have been appointed for the purpose of representing the parties, they should be capable of presenting the issues with sufficient clarity to permit a proper evaluation, and court members are not substitutes to fill their shoes if they fail. The members are selected for the purpose of ascertaining impartially wherein the truth lies. However, they become biased arbiters when they pit their skill as interrogators against the recollection of the witnesses, for the examination generally takes the form of an attack on the credibility of the person on the stand, and they are always sure they have successfully established that the witness is not worthy of belief. One can readily appreciate that a trial gets out of control when some members of a court consider that they are pseudo lawyers and then are permitted to practice their art from the fact finders bench. Unfortunately, a fair appraisal of the activities of the court members in this instance leads me to believe their efforts were untimely and improperly aided them in finding the accused guilty.

The law officer in this case must accept a fair share of the responsibility for the improper conduct of the trial. Undoubtedly he was faced with an eager beaver who was intent upon showing

talents far beyond any minimum requirement. When it became apparent that he and other members were stepping out of character, the law officer should have assumed the role of a judge and asserted his authority to direct the course of the proceedings. The first cross-examination conducted by Colonel Todd should have placed the law officer on notice that there would be over-reaching by at least one member of the court, and he should have taken some steps to restrict future participation. There are well accepted methods of limiting members of a court when they misunderstand their functions. If there are areas of uncertainty in the minds of the court members, they can be mentioned to the law officer, and he or counsel can take over the interrogation to remove the doubt. If, thereafter, members seek to ask questions, the law officer can determine the nature of the testimony desired. He must rule on the competency, materiality, and relevancy of the desired information, and he can do that in advance, if necessary. He need not require defense counsel to shoulder the burden of resisting the questioning by a member of the court at the expense of offending the interrogator. If no better way presents itself, the law officer can require the members to submit their questions to him in written form. That might discourage pretended lawyers on the court from being over-zealous, and it would have a tendency to confine them to their proper sphere of activity.

I am not inclined to invoke the doctrine of waiver in this case because of the fact that a miscarriage of justice might result from an affirmance of this judgment. However, I do not absolve trial defense counsel for their failure adequately to protect their client. Not once did they object to the excessive participation of court members. There is some merit in the statement quoted from the Manual to the effect that defense counsel hesitate to object to questions asked by court members for fear of prejudicing their client. However, there comes a time when action is demanded. If defense counsel had been faced with isolated instances where court members were truly trying to

**336**

clarify areas of doubt, an excuse might be in order, but at some point early in these proceedings defense counsel should have realized that Colonel Todd was casting about in the role of an opposing lawyer. It is better for counsel to run the risk of vexing a court member than it is to sit idly by and lose their cause.

It is asserted by the Government that the principal offender examined witnesses for both parties and was merely searching out the truth. The difficulty with that contention is that it overlooks the obvious fact that when extensive interrogation by a court member is carried on, it must of necessity further the cause of one of the parties. Experience has taught me that usually it aids the Government, and this case fits that pattern. Colonel Todd's accomplishment in this instance can be illustrated by referring to a few of his attempts to destroy the effect of certain evidence produced by the defense and to strengthen that furnished by the prosecution. His repeated efforts to introduce incompetent evidence of intoxication through a medical officer, contrary to the rulings of the law officer, bespeak an ardent desire to aid the prosecutor. A number of witnesses testified to the bad character of the deceased and his reputation for being violent. The Colonel went to some lengths to undermine the basis for their conclusion, and his questioning would have done credit to a prosecutor intent upon winning his case. When a nineteen-year-old witness testified that the accused acted like a person out of his mind, Colonel Todd depreciated that testimony by a series of questions which established the witness' youth and lack of experience to support his conclusion. Major Green was recalled as a witness after the instructions had been given by the law officer. Some six pages of the record are devoted to the examination conducted at that time by Colonel Todd and other members of the court to bolster the case for the Government. In one instance, the law officer suggested to defense counsel that an objection might be in order. When it was finally forthcoming, it was sustained, and that is the reason for the

statement made by Colonel Todd on the following morning wherein he requested the law officer to reverse his ruling. Not only did Colonel Todd indulge in considerable cross-examination of this witness, but when the law officer refused to permit an answer to one question, the Colonel apparently spent some time during the evening in preparing a statement as to why the law officer should reverse himself. Other instances could be referred to, but they are unnecessary to prove the point.

While, as stated by Colonel Todd, he had a serious duty imposed on him, he misunderstood the nature of that duty.

He was not ordered to sit in judgment for the purpose of joining hands with either counsel. His duty was fully and fairly to determine the issues as they were presented to him within the framework of the Uniform Code of Military Justice. His successful attempts to influence the quality and quantity of evidence placed before the court-martial could not help but have a profound influence on the other court members. In that climate, the probabilities that the accused was afforded a fair trial are remote. At the least, he is entitled to be tried by another court whose members are limited to their proper role as triers of fact.