UNITED STATES, Appellee

v

JOSHAWAY MARSHALL, JR., Airman Second Class,
U. S. Air Force, Appellant

12 USCMA 117, 30 CMR 117

No. 14,333

Decided January 19, 1961

*Major Charles K. Rush* argued the cause for Appellant, Accused. With him on the brief was *Colonel James L. Kilgore.*

*Captain Richard T. Yery* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Merlin W. Baker.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Tried by special court-martial, the accused was found guilty of larceny, and sentenced to bad-conduct discharge, forfeiture of $70.00 per month for six months, confinement at hard labor for six months, and reduction to the lowest enlisted grade. Intermediate appellate authorities affirmed, and we granted review on the issue whether the members of the court-martial constituted themselves partisan advocates for the Government.

The evidence in the record establishes that a wallet, containing approximately $250.00 in cash and $160.00 in travelers' checks, was taken from the trousers of a Staff Sergeant Berry on the night of December 4–5, 1959, while he was sleeping in his barracks. The currency consisted of twelve twenty-dollar bills and one ten-dollar bill. "For large amounts," twenty-dollar notes were most commonly used at accused's base. On the morning of December 5, 1959, Sergeant Berry discovered his loss and, en route to his orderly room, found his trousers, from which the wallet had been removed, in the barracks' latrine. A handkerchief belonging to an Airman Morris was found with the trousers. On December 7, 1959, Airman Marshall was apprehended by the Air Police. A search of his person resulted in the discovery, among other items, of Sergeant Barry's wallet, some keys, a five-dollar bill, and a few coins.

Other evidence presented by the Government tended to establish that the accused was deeply in debt, principally to a hotel at which he and a female companion resided. Accused's girl friend had come to France from Scotland at his request. The hotelkeeper, Mr. Koupermann, complained on December 4, 1959, to accused's commanding officer concerning his nonpayment of the debt and threatened to lodge an information with the French police. At approximately 6:30 a.m. on December 5, 1959, accused paid his hotel bill, in the amount of $200.00, by giving Koupermann ten twenty-dollar bills. On the following day, he paid the hotelkeeper an additional twenty dollars as a "down payment" on the future rental of his room.

The case for the defense involved several witnesses. Proof was adduced of accused's character for honesty, and it was shown that Airman Morris, the owner of the handkerchief found with Berry's trousers, did not know Marshall or Berry and had never loaned such an item to either of them. Access of others to Berry's belongings was also established.

Accused appeared as a witness in his own behalf. He described his movements on the night of the theft and denied entering the victim's barracks. Following an unsuccessful attempt to determine the whereabouts of his girl friend, who had temporarily left the hotel, accused encountered Mr. Koupermann in the establishment's bar. After some discussion, accused paid his overdue bill with American currency, not all of which was in notes of twenty-dollar denominations. He had previously explained to Koupermann that he would not pay the debt until he checked out of the room which he and the girl occupied. They planned to return to Scotland during the Christmas holidays. The money with which accused paid his bill came both from an accumulation of funds prior to the arrival of his girl friend from Scotland and from gambling.

With regard to his possession of the victim's wallet, accused testified that he had found it, together with the keys, on the morning of December 7, 1959, while en route to work. The empty wallet and keys were lying on top of a trash can in the Air Police building. He picked up the items principally because of the keys and intended to turn them in "To the lost and found." However, he had not done so

118

when he was apprehended on the same day.

After thorough cross-examination of the accused by the trial counsel, members of the court, commencing with the president, embarked upon an extensive additional inquisition. The president's questions initially involved accused's income and expenses and his reasons for not paying his hotel bill at an earlier time. The following interrogatories exemplify the tone of his examination:

"Q. Have you not learned that it is customary at the end of the week, or shortly thereafter, that you pay your hotel bill, or that it is expected you pay it when you're due.

"A. Sir, the hotels I was connected with before, it was customary if you stayed there and you had baggage with you, you paid when you finished.

"Q. Where did that take place?
"A. In Scotland, sir.

"Q. Where?
"A. In Scotland.

"Q. So that if you moved, according to this then, you're telling me the custom of Scotland is if an individual moves into a hotel, with, we'll say, a thousand dollars worth of luggage and personal possessions, that they would never bother him about his bill until it exceeded a thousand dollars?

"A. No, sir; I'm not saying that, sir. I didn't have that kind of luggage out there, but I do know there was a time I went on leave, and this leave was for 17 days, and I spent the 17 days there and I paid when I left, sir.

 · · · · ·

"Q. You still haven't answered the question, why you didn't pay it.
"A. Because I had planned, and I told it to him, and I stated to him then and there, at such time the bill was given to me, I was not finished then, and I would be finished in a couple weeks, and I would pay him at that time, and he should have no worry about his money at all, because I was going to pay it, and I

had given him correct information as to where I was stationed, who my commander was, and all, sir.

"Q. And he didn't protest?
"A. Not to me he didn't, sir.

 · · · · ·

"Q. I don't set myself up as an expert judge of character, but this Mr. Koupermann strikes me as being a hardened businessman, and I believe it's generally found to be true that hotel keepers are a little bit more sceptical [sic] about honesty of people than the average of us are, because they have had more experience in people trying to beat them out of money.

"A. Sir, when I explained this to the gentleman, that I would pay when I finished, I can truthfully say that I did not get no argument, or that he did not seem to be worried about me, and I can also say truthfully that I know exactly when he really did start worrying about it, which was that same week, the week of the 4th.

 · · · · ·

"Q. Have you not known prior to 4 December, and prior to Mr. Koupermann's visit to the base, that the Air Force frowns on its members not paying their debts when due?

"A. Yes, sir; I know that. I did know that, sir, but as far as Air Force members are concerned, they did not know that I did owe this bill, because this man had not came out to tell them.

"Q. But you did learn, according to your testimony, that prior to the 5th or 4th of December, that Mr. Koupermann had visited Colonel Bragg—Bragg is it?

"A. Yes, sir.

"Q. —that you did owe him money. Why didn't you go on in and pay him?

"A. I had told this man, I believe around the 1st or 2nd of December, that I would be in as shortly after four-thirty as possible to pay him, and he said that was O. K., and that he would be expecting me at or

about four-thirty that Friday evening.

．　　．　　．　　．　　．

"Q. Was a paternity claim ever made against you?

"A. No, sir.

"Q. You say that no one saw you pick up this wallet and the keys?

"A. No, sir; I don't believe there was—I know there wasn't anybody in the hall.

"Q. A lot of strange things happen in this world, for reasons we can't figure out, but doesn't it seem odd that of all the people, of all the airmen on this base, and civilians, that you should be the one to find this wallet and keys, and the air police select you for apprehension, and find the keys and wallet on your person?

"A. Yes, sir. That's the question I've been asking myself ever since I found myself in this predicament, sir.

．　　．　　．　　．　　．

"Q. Do you have any idea who took this money, if you didn't take it?

"A. None whatsoever, sir.

．　　．　　．　　．　　．

"Q. For your information, that is not a sign of being automatically guilty. As was testified the day before yesterday, this was an air police investigator who had you apprehended in pursuit of his duties, to try to find someone who might have committed the crime of which he had been aware. People, many people, are questioned as to their knowledge of a crime by investigators, whether you be in the military or what have you. Guilt is never determined until that individual has a trial. In fact, it hasn't been determined yet, whether or not you are guilty. That is what we are working on now.

"A. But, sir, from these air policemen, the things that they said to me during their investigation, they didn't need nobody but me, sir.

．　　．　　．　　．　　．

"Q. Why did you feel compelled

to disturb this wallet and the keys at all, in a building to which you are not assigned, and in which you really had no business, and this, according to you, was lying out in the open, on the top of this trash container?

"A. Sir, I feel pretty sure that when I did see that wallet, that I didn't have the idea that it was empty or nothing like that, but if I picked the wallet up, and it had an ID card or pictures, something like that, I'd have figured then and there to get it back, because I'd have figured it belonged to somebody in the building there, but the thing was empty of identification and the only things in there was keys and the comb."

After the end of the foregoing interrogation, the president and the defense counsel engaged in the following exchange:

"DC: I don't believe I heard the president's remark. Could we have it for the record, sir? Was it something to do with, 'You try him.'

"PRES: No, no, 'You try,' meaning, 'It's your turn to try to get information.' Obviously the whole court is trying the case."

The invitation extended by the president to the court member was not spurned, for he immediately set out to examine accused closely concerning his activities on the day in question. Finally, defense counsel interrupted the proceedings with a statement that he had not objected earlier to the court's questioning of accused because he feared it would "antagonize" the members. He asserted, however, that he believed several of the fact finders "now have become members of the prosecution" and moved for a mistrial. When the trial counsel declined to answer the motion, the president declared:

"PRES: As to the defense counsel's opening statement as to—I don't remember the exact wording of it, but it had to do with prejudicing of the court, I think that counsel can be assured that neither the de-

fendant nor his counsel could prejudice the court. The members of the court, I believe, are all mature individuals who have sat on numerous trials before and recognize the right of the defendant—or accused—to a vigorous defense. So I don't believe it would prejudice the court by taking exception to questions propounded by the court. I think defense counsel must take into consideration, while there is some merit, considerable merit, as to the absolute relevancy of certain questions that have been asked, that the question of credibility is certainly an issue in consideration of the accused's testimony, and that has been one objective in some of the questions expounded, or put forth, by at least the president of the court.

"This court, of course, is always ready to consider an objection by defense counsel on any question put forth by a member of the court, or by the Government, if there are grounds which the defense counsel thinks exist for the impropriety of that question.

"We have to consider the sworn testimony of one witness against another one. You have heard the results of some of the questions that I asked the accused as to why he didn't pay, some of his answers, as to the fact that he was not even asked to pay, and yet, if you wish I can have the testimony read back to you of Mr. Koupermann, in which he stated that starting approximately eight days after the first occupancy of the hotel, that he demanded payment, and once he was told by the accused that the accused couldn't pay because he had to rent a house; and in another case—"

The trial counsel promptly objected to "any attempt to sum up the evidence in open court" as "not . . . proper procedure." The president then ruled that he would "discontinue that trend of explanation" and denied the motion for a mistrial.

Following a brief recess, another court member engaged in the examination of the accused concerning his financial arrangements. He was followed by yet another member who made similar inquiries. The president briefly renewed his interrogation and, after counsel had asked a few additional questions, accused left the stand. Following the introduction of rebuttal evidence by the Government, both sides rested.

It is, of course, the participation by the court members heretofore set forth that gives rise to the granted issue. In arguing and briefing the appeal, both the Government and the accused are in agreement concerning the law to be applied but differ on the ultimate issue, i.e., whether the record establishes the existence of partisan advocacy. Thus, the question for our determination is "simply whether the members of the court . . . were willing to accord fair consideration to all the evidence in the case or whether their participation in the proceedings establishes a propensity to convict, regardless of the matters presented." United States v Flagg, 11 USCMA 636, 29 CMR 452, at page 639; United States v Carver, 6 USCMA 258, 19 CMR 384; United States v Blankenship, 7 USCMA 328, 22 CMR 118. After reading this record, we are unable to see how any conclusion could be reached other than that the members of the court, particularly the president, had closed their minds to accused's possible innocence and were determined so to discredit his testimony that it would become apparent to all who scrutinized their efforts that he was totally unworthy of belief. Indeed, little effort was made by the president to conceal his partisanship, and reference need only be made to his impassioned oration in response to the defense counsel's motion for a mistrial to disclose the motivation for his examination of the accused. Thus, while it is difficult normally to derive the tone of a court-martial's investigation in the examination of the accused and other witnesses from "the cold pages of an ordinary transcript of testimony," see United States v Flagg, supra, at page 640, we have no trouble in visualizing the attitude of at least

121

some of the members of this court-martial. In short, these proceedings convincingly demonstrate that these members assumed the role of "pseudo-prosecutors seeking to salvage a case for the Government." Concurring opinion of Judge Latimer, United States v Flagg, supra, at page 640.

There is some implication in the Government's brief that the accused could not have been ▮▮▮▮▮▮▮ ▮ harmed by the court-martial's unwarranted participation in the proceedings, as his testimony was inherently incredible. Aside from the important question of the basic fairness of the hearing which led to his conviction, we point out that the accused's prosecution was entirely premised upon the discovery of some of the stolen property in his possession and the fact that he had paid a long overdue account in bills of the denomination stolen. The evidence adduced by the defense proffered an innocent explanation for these otherwise incriminating circumstances. Were accused's testimony accepted as true, he would be entitled to an acquittal. We cannot at this level reject his declarations concerning his possession of the victim's wallet and keys as incredible, nor can we dismiss his explanation of the sudden possession of sufficient funds to pay his hotel bill as mere fantasy. Such events do occur, and while they may not appear believable to the fact finders, we are not able cavalierly to disregard them. It is apparent, therefore, that a factual issue existed for resolution by the court members and when it was attempted to destroy that issue by partisan means on their part, reversal is required on that basis alone. United States v Flagg, supra; United States v Blankenship, supra.

We cannot leave this matter without expressing surprise at the continued existence of behavior of ▮▮▮▮▮▮▮ ▮ this nature on the part of court members. To be sure, the military fact finders have the right and, indeed, the duty to ask questions which clarify matters presented in evidence and tend to furnish further information relevant to the charges on which the accused has been arraigned. We have continually recognized this privilege. United States v Blankenship, supra; United States v Smith, 6 USCMA 521, 20 CMR 237; United States v Flagg, supra. At the same time, and in the same causes, we have pointed out the necessity for maintenance of an impartial attitude throughout the trial and have not hesitated to reverse when members abused their right in an effort to assist the Government.

It seems that, after the establishment of so many precedents in this area, action would have been taken to eliminate this senseless tendency on the part of court members to ally themselves with the prosecution. In his concurring opinion in United States v Blankenship, supra, Judge Latimer drew attention to the submission of written questions to the law officer as a means of combatting this evil. We realize that this procedure may not prove workable in special courts-martial, but we are certain that equally effective means may be devised whereby these lesser tribunals can be reminded of the proper limitations upon their role. For example, counsel might proffer correctly phrased instructions to the president at the outset of the trial, in which court members would be reminded of their duty to maintain an open mind until their deliberations commence. Convening authorities or other appropriate officials might consider inclusion in orientation lectures of material relating to the proper use of the court's interrogative privilege. We are certain that other measures will occur to resourceful judge advocates, and we offer the foregoing merely as possible means of correction.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN and Judge LATIMER concur.