UNITED STATES, Appellant

v

EDWARD E. COOK, Seaman, U. S. Navy, Appellee

11 USCMA 99, 28 CMR 323

No. 13,304

Decided December 24, 1959

*Major George M. Lilly*, USMCR, argued the cause for Appellant, United States.

*Commander John P. Gibbons*, USN, argued the cause for Appellee, Accused.

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This case is before us on a certificate of review by The Judge Advocate General of the Navy.

During a barroom fight, a Philippine national was struck on the head. A few days later he died in the local hospital. An autopsy indicated that death resulted from epidural hemorrhage from a head wound probably caused by a blunt instrument. Eventually, a charge of voluntary manslaughter, in violation of Article 119, Uniform Code of Military Justice, 10 USC § 919, was lodged against the accused. An investigation under the provisions of Article 32 of the Code was held and the investigating officer reported that "nothing conclusive" appeared to implicate the accused as "the offending party." Accordingly, he recommended that "no court-martial be awarded" to the accused. Nevertheless, the officer who ordered the investigation recommended to his superior commander that the accused be tried because there was substantial evidence to connect him with the incident and because "the special circumstances surrounding the case are such that it is believed" the accused's guilt or innocence should be determined by court-martial.

In due course the accused was brought before a general court-martial and arraigned on a voluntary manslaughter charge. He pleaded not guilty but was convicted of the lesser offense of involuntary manslaughter by reason of culpable negligence and was sentenced to a bad-conduct discharge, total forfeitures, reduction to Seaman Recruit, and confinement at hard labor for one year and six months. The conviction was affirmed by the convening authority. However, a unanimous board of review set aside the findings of guilty and the sentence on the ground that the accused was prejudiced by the improper remarks of the prosecuting attorney. The Judge Advocate General asked us to review the board of review decision on the following issues:

"(a) Whether the trial counsel's argument, as presented to the members of the court prior to the findings, was prejudicial to the accused;

"(b) Whether the trial counsel's argument, as presented to the mem-

bers of the court prior to the sentence, was prejudicial to the accused;

"(c) Whether the action of the convening authority constituted the accused a 'probationer', as that term is used in Article 72, UCMJ."

A number of witnesses testified to an altercation on the third floor of the Washington Nite Club, Asinan, Olongapo, Zambales, in the Republic of the Philippines. Julie Gracila, a Philippine national, testified for the prosecution. She said that she saw the accused strike the decedent over the head with a wooden chair. However, she admitted she just saw the assailant "in the side view." Also, she admitted that before trial she saw the accused in a line-up on board a ship and did not identify him as the person who had wielded the chair which struck the deceased, Rolando Cosca. She further admitted that in the pretrial investigation she testified she could not pick the man out of a group. At trial, she represented that she had decided it was the accused who was the assailant.

Apart from impeachment, there are material differences between Gracila's testimony and that of other prosecution witnesses. Thus, she maintained that the accused raised the chair over his right shoulder and threw it "in a swinging motion—towards the Filipino man," whom she had earlier admonished to leave his American companions because they were not his "friends." She indicated that the distance between the two men was four feet. Another witness placed the accused and Cosca six feet apart, with the deceased leaning over the railing at the back of the stairway leading to the second floor and the accused at the head of the stairs engaged in an argument with another sailor. The latter witness saw the accused raise a chair over his *left* shoulder but he did not see what happened because the girls started "running around." Coupling this testimony with that of Fireman Apprentice Osborn, who also said that the accused raised a chair over his left shoulder, it might be reasonably concluded that the accused's chair hit Osborn who was standing at

**101**

the top of the stairs. Other testimony indicates that at least one other person raised a chair above his head for apparent use in the altercation.

The brief review of the evidence set out above is sufficient to show that, despite the direct implication ■■■■■■ ■ of the accused by a purported eyewitness, there is a good deal of testimony which could create a reasonable doubt of guilt in the minds of the court members. Consequently, we agree with the board of review that the evidence of the accused's guilt is neither overwhelming nor compelling. In such a situation, an untoward incident or inflammatory remark in the presence of the court members could substantially influence them in their deliberations. It is in the light of this circumstance that trial counsel's argument must be evaluated. United States v Beatty, 10 USCMA 311, 27 CMR 385; United States v Doctor, 7 USCMA 126, 133–135, 21 CMR 252.

Trial counsel started his opening argument with the following statement:

"TRIAL COUNSEL: If it please the court, the law officer, at this time the prosecution would like to indulge the court's attention for a brief argument. I would like to touch upon the evidence brought forth at the trial. Also, later on, to touch briefly on the seriousness of this case, the impact that this case will have, not only on the military body but also on life generally here for the American forces."

Counsel then proceeded to review the evidence and the defense. He maintained that the defense had "strenuously" attacked the ability of "certain witnesses" to identify the accused but that it had not challenged their ability to tell the truth. "These witnesses," he said, "no matter who they are, no mat-ter how poor they are, no matter what their station in life, they have come in here asking you to believe them." Defense counsel did not interrupt the prosecuting attorney's argument, but he opened his own argument as follows:

"DEFENSE COUNSEL: First I will make a few comments on some of trial counsel's argument. I agree with the trial counsel that this a very serious offense and would like to stress that in such cases the degree of proof has to be commensurate with the seriousness of the offense. Trial counsel also commented on life here for the American forces and the fact that it might be affected by this trial. As far as I'm concerned, and I submit to you that as far as you're concerned, that's completely irrelevant. You're here in this trial to decide just one thing, and that is whether or not this accused man has been proved guilty of this particular offense beyond a reasonable doubt."

Finally, trial counsel made a "few closing remarks." Among them is the following:

"This is a tremendously important case. As I told you before, this case is important because we're trying a man who is here accused of killing a Philippine national, at which we're using mostly Filipino witnesses. I think that we can show everyone concerned, everyone concerned with this case, that we can ensure that justice will be done. And that's the important thing."

At the conclusion of trial counsel's remarks, defense counsel started to say something to the law officer but was interrupted by an objection by trial counsel. What transpired is set out in the margin.[1]

No useful purpose can be served by

[1] "DEFENSE COUNSEL: Mr. Law Officer, just . . .
"TRIAL COUNSEL: I object.
"DEFENSE COUNSEL: . . . one thing that I feel is important to mention . . .
"TRIAL COUNSEL: I object.
"LAW OFFICER: Request for further argument on the part of the defense is denied.

"The defense has also submitted an instruction requesting . . .
"DEFENSE COUNSEL: Mr. Law Officer, I understand that I'm to have no further argument? I object, and take special exceptions to any such ruling.
"TRIAL COUNSEL: Let it be noted in the record.
"LAW OFFICER: So noted."

discussion of the many cases dealing with the effect of remarks by the prosecuting attorney. We have reviewed the general principles in several recent cases. United States v Britt, 10 USCMA 557, 28 CMR 123; United States v Hickman, 10 USCMA 568, 28 CMR 134; United States v Skees, 10 USCMA 285, 27 CMR 359; see also United States v Hurt, 9 USCMA 735, 27 CMR 3. Suffice it to say that an appeal to a court-martial to predicate its verdict upon the probable effect of its action on relations between the military and the civilian community "pose[s] theories which are not supported by testimony and which operate as a one-way street against the accused." United States v Mamaluy, 10 USCMA 102, 27 CMR 176.

We share the board of review's conviction that trial counsel's remarks in this case exceed the bounds of fair comment and injected improper matter into the case. In light of the evidence, we cannot be certain this did not prejudice the court-martial against the accused. United States v Brennan, 10 USCMA 109, 27 CMR 183. The Government contends that defense counsel waived the claim of error by failing to object. We are not at all sure, however, that defense counsel did not want to object. He had objected earlier to trial counsel's improper remarks and it is not unreasonable to suppose he wanted to answer the improper remarks by further argument. In this record there is no clear indication of waiver. Much is made of the fact that the accused was convicted of the lesser included offense and that he received a relatively light sentence. These circumstances, it is argued, demonstrate conclusively that the accused was not prejudiced by trial counsel's remarks. In our opinion, they can reasonably indicate that, except for trial counsel's emphasis of the importance of the case to military-civilian relations, the court-martial might have acquitted the accused. Cf. United States v Richard, 7 USCMA 46, 52, 21 CMR 172. We conclude that the board of review was correct in its determination of prejudice and we answer the first certified question in the affirmative.

Our answer to the first question makes it unnecessary to consider the other matters raised by The Judge Advocate General's certificate for review. Nor need we consider several questionable rulings by the law officer, which might otherwise be necessary in the interests of justice.

The decision of the board of review is affirmed.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

This case poses the delicate problem of ascertaining whether a few ill-chosen words by trial counsel in his closing argument had any measurable impact on the court-martial's finding and sentence. My two associates find that the argument may have influenced the conviction, but my interpretation of the record forces me to a contrary conclusion.

Before discussing the alleged prejudicial impact of the comments, I believe it advisable to state why I believe waiver should be dispositive of this issue. The general rule in most civilian jurisdictions is to the effect that arguments of counsel at trial cannot be reviewed on appeal unless an objection is taken at the time they are made. Myres v United States, 174 F 2d 329 (CA 8th Cir) (1949); United States v Langford, 178 F 2d 48 (CA 9th Cir) (1949); Mitchell v United States, 208 F 2d 854 (CA 8th Cir) (1954). We expressly adopted that principle in United States v Doctor, 7 USCMA 126, 21 CMR 252, and United States v Sims, 5 USCMA 115, 17 CMR 115.

The general rule is not inflexible as it is tempered with a requirement that an appellate court should not affirm a conviction on the theory of waiver if there is grave error in the record which if glossed over will result in a miscarriage of justice. I believe that to be sound doctrine but the possibility that a miscarriage of justice will result in the case at bar if we invoke waiver is nonexistent. Of course, when this sort of error is raised for the first time on ap-

peal, we are always met with the contention by appellate defense counsel that the arguments at the trial inflamed the court-martial members against the accused. That claim is easy to assert but rather difficult to justify when trial defense counsel is so little impressed with the character of the subject matter of the discourse that he fails to object. Certainly I experience some difficulty in finding that arguments incite anger, animosity, or illwill and divert the minds of court members away from their primary duty when trial defense counsel is so little concerned by what is being said that he sits in silence and asks for no curative measures by the law officer. It may be, as some contend, that defense counsel hesitate to challenge the rulings of a law officer or oppose the desires of court members for fear of incurring their displeasure. I need not comment on that concept but, even assuming its validity, it is of no importance in a situation where defense counsel is only called upon to keep opposing attorneys within fair bounds in their final arguments. If reversible error is found at the appellate level when, as in the case at bar, the discourse is given without objection and corrective action which could be taken by the law officer to cure the harm is not requested, the defense gains by remaining silent. Decisions which encourage that sort of practice do not aid in the orderly administration of justice.

The Court does not meet the waiver issue head on for my associates state they are not sure defense counsel did not want to object. That uncertainty is based upon a strained construction of the transcript but, in all events, doubts should not be used as the vehicle for disposition of this case for at least three reasons. First, it was incumbent upon defense counsel to preserve his record and thus avoid the necessity of requiring us to speculate on trial court incidents. Second, an objection should have been in such form that the law officer was put on notice of the asserted error so that he could take appropriate action. Third, the record shows the following situation which precludes any finding that any objection was, in fact, intended or registered. In his opening remarks,

trial counsel mentioned the impact of the case on the American forces in the Philippines. Defense counsel made no objection to that comment. On the contrary, he bided his time and chose to answer it in his argument by saying it was irrelevant to the issues, that it should be ignored, and that the duty of the court was to determine the guilt or innocence of the accused from the facts. That procedure seems to fit in the mold suggested by the Chief Judge in United States v Hurt, 9 USCMA 735, 27 CMR 3. When trial counsel made his final summation, he included the statements quoted in the majority opinion. In a footnote to the opinion, there is set out the colloquy between defense counsel, trial counsel, and the law officer. To put that discussion in its proper perspective, I call attention to the fact that it did not immediately follow the questionable comments. As the record shows, after the allegedly objectionable statements, trial counsel went on to enumerate the various elements of the principal offense and then those of the included offense. He next informed the court that the law officer would instruct on those elements and the other issues. He admonished the court that it had the duty to determine the facts from the testimony of witnesses and then conclude whether all elements had been proved beyond a reasonable doubt. Thereafter, he recited those facts which he contended the Government had established. He summed up his arguments by telling the court-martial members if they would base their findings on what the witnesses testified to, he believed they would conclude beyond a reasonable doubt that the accused struck the victim, that, in wielding the chair, he intended to inflict great bodily harm, that the victim was dead, and that the accused was guilty. It was not until after trial counsel had discussed all the foregoing matters and thanked the court for its attention that defense counsel stated he believed it important to mention an item, not identified in the record because of an objection. As I interpret the language he used, I conclude he merely wanted to further argue the facts. That is made clear by this statement which he made:

"Mr. Law Officer, I understand that

I'm to have no further argument? I object, and take special exceptions to any such ruling."

The foregoing statement shows the only objection registered and it was to the law officer's refusal to permit the defense to have the last word. Certainly, it is apparent from this record that defense counsel did not at any time call directly to the attention of the law officer by any acceptable method any improper statement made by trial counsel. Nor could anything said by him be construed reasonably to put the law officer on notice that the defense was complaining of unfair arguments.

The next portion of this opinion should serve a dual purpose. First, it will articulate why I find no prejudice and, second, it will point up the improbability that by affirming this conviction a miscarriage of justice may result. Assuming arguendo that defense counsel saved the point for purposes of appeal, I am unable to ascertain how, or in what way, the argument could have any possible impact on the findings and sentence. To strenghten my presentation, I make a short statement of facts. The incidents leading up to and resulting in the killing are those sometimes found in barroom brawls. Certain members of the United States Naval service, together with some Philippine nationals, became embroiled in a free-for-all fight in a nightclub. The accused, using a chair as a weapon, proceeded to flail away at certain of the participants. Two of his targets were a fireman apprentice, United States Navy, and the deceased victim. Four Philippine nationals and two Americans testified that the accused had a chair and was swinging it at various participants. One of the former class testified that she observed the accused hit the deceased with the chair. Another testified he saw the accused throw a chair and saw a chair hit the victim. Because of a momentary blocking of his vision, he could not follow the entire path of the chair; but the course, the time between the throwing and striking, the distance between the parties, and the fact that the witness saw no one else using a chair exclude any hypothesis except that the chair was thrown by the accused. Several witnesses, including the American, Osborn, testified to the fact that accused struck Osborn on the head once with a chair and tried a second time to fell him. Every witness but one testified that accused was the only person who used a chair. That one witness testified one other person raised a chair but, because of the witness' restraining efforts, the chair was put back on the floor.

The defense evidence consisted generally of testimony that the accused did not have a reputation for violence. It will thus be observed that there is no dispute concerning the facts of the substantive offense, and that the Government's evidence that the accused was responsible for the death is unrebutted. Therefore, if the argument had any impact on the court-martial, it could only be that it influenced the court to return a finding of guilt when the court otherwise would not have convicted the accused. But that is a rash assumption because, unless the court members disbelieved the testimony of all the witnesses, the only verdict the court could return was one of guilt.

To support the contention that the Government's case was weak, my brothers make mention of certain inconsistencies in the testimony. By way of illustration, they say that one witness said the accused raised the chair over his left shoulder, while another contends the chair was over the right shoulder. Obviously both could be correct, depending upon the moment the witness happened to see the position of the chair. Those incidental inconsistencies are of little importance in this sort of setting, for the participants were moving and the situation was fluid. Moreover, it would be somewhat suspicious for witnesses observing a group fight to agree on all the details of the melee.

Some suggestion is advanced that the prosecution's case was weak because the credibility of the one female witness was impaired by prior inconsistent actions and statements. Of course, whether she was to be believed was a matter to be determined by the triers

of fact but, pretermitting that principle, this record does not establish that she was untrustworthy. Every witness corroborated her story that accused was swinging a chair, and other circumstances give credence to her story. She did not pick the accused out of one line-up for the simple reason that he was not present. She explained her failure to identify him on the other occasion by stating she did not pick him out because other witnesses would not become involved. There was no uncertainty about her in-court testimony on identity, and she was corroborated by a witness who appeared on the scene of the fight before the heat of battle had ceased and to whom she pointed out the accused as the person who hit the victim. In summation, a fair reading of her testimony at trial, compared with the answers given by her at the pretrial hearing which were used for impeachment purposes, shows merely a desire to avoid becoming a witness in criminal litigations.

One other fact mentioned in the Court's opinion bears mentioning. The investigating officer recommended against holding the accused for trial. Although it is elementary that the strength or weakness of the prosecution's case against an accused depends solely on the evidence adduced at trial, and is not contingent in any way on preliminary proceedings, it is interesting to note the investigating officer's full statement:

"There is not sufficient evidence to prove that Cook wielded a chair which either directly or indirectly struck Cosca resulting in the latter's death.

"Only one witness, Julie Gracila, testified that Cosca was hit directly by the chair-wielder; and on further investigation she testified she could not identify him now or previously at the line-ups conducted by the Security Department. Cook was in the line-ups aboard the ALUDRA.

"Eyewitnesses testified that Cook had a chair off the deck but only disengaged some lights over the stairway. Statements by several hostesses indicated a chair was broken over the banister but testimony by the ALUDRA men indicated no chair was broken by Cook. A splintering noise was heard by several sailors at which time they saw Cook with an unbroken chair in his hand. Cook was some three to six feet from the banister at this time.

"Testimony indicated a large group of sailors were involved in the melee but nothing conclusive indicates that Cook was the offending party. Therefore, my recommendation is that no court-martial be awarded to Cook, E. E., SN, USN."

When consideration is given to the facts shown in the second paragraph and that there were some eyewitnesses to the tragedy who were not interviewed by the investigating officer, it is apparent he was relying on evidence different than that furnished at trial. Accordingly, his conclusions—even if applicable—neither add to nor detract from the strength of the Government's case.

Finally, in considering whether this court-martial was unfairly aroused by the argument, I suggest we consider the findings and sentence. The accused was charged with voluntary manslaughter which carries a maximum penalty of ten years confinement. He was found guilty of the lesser included offense of involuntary manslaughter which allows confinement for only three years. He was sentenced by the court-martial to eighteen months confinement with accessories. The consideration shown the accused in the findings and sentence shows persuasively that this court was not aroused by the alleged misconduct of trial counsel. Accordingly, I conclude that the latter's argument affected neither accused's conviction nor his punishment.

For the foregoing reasons, I would answer the first and second certified questions in the negative. In view of the disposition ordered by the majority, it is unnecessary to consider the third certified issue.