UNITED STATES, Appellee

v

ROBERT B. FLAGG, Sergeant, U. S. Army, Appellant

11 USCMA 636, 29 CMR 452

No. 13,766

Decided July 8, 1960

*First Lieutenant Vernon C. Maulson* argued the cause for Appellant, Accused. With him on the brief was *Major Edward Fenig.*

*First Lieutenant Richard E. Wiley* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *First Lieutenant Allen I. Saeks.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was found guilty of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for one year. Intermediate appellate authorities affirmed, and we granted the accused's petition for review on the issues whether the law officer and members of the court-martial cast aside their impartial roles in order to become partisan advocates of the Government and whether the trial coun-sel erred prejudicially by adverting in his presentencing argument to the effect of accused's offense upon good German-American relations. In view of our disposition of the case, we need not reach the second issue. See, however, United States v Cook, 11 USCMA 99, 28 CMR 323.

In December 1958, accused ordered a set of chinaware from the Bavaria Company. According to prosecution witnesses, an attempt was made by a local German express company to deliver the shipment on December 23, 1958. However, they were unable to

636

locate accused's quarters. The express draymen asserted that they eventually delivered the china during the early part of January 1959. An acknowledgment of its receipt was not obtained, although such was normally required, as accused's wife did not possess the funds with which to pay the delivery charge of two marks. On the following day, one of the draymen returned and obtained payment of the fee. No receipt was secured on this occasion, as he had forgotten to bring the necessary papers with him.

In a lengthy correspondence with the Bavaria Company, the accused repeatedly complained that he had not received his order. An investigation was commenced by that organization, an official of the German Federal Railroad, and the express company. An officer of the latter attempted to have the accused execute a certificate that he had received the china. He refused to do so and again denied its delivery. He received a reshipment of his order on April 23, 1959.

In June 1959, military police commenced an investigation into the matter. An agent of the Criminal Investigation Detachment interrogated the accused after properly advising him of his rights under Code, supra, Article 31, 10 USC § 831. He declared that the accused orally admitted receipt of both sets of china. When he was asked why he had claimed previously that he had not received the goods which he had ordered, accused replied "by saying he had no reason. However, that in three or four days he would think of a good reason." A subsequent authorized search of accused's quarters disclosed the presence of four boxes of china in his maid's room and a separate service of the same pattern in his china closet. The boxes in the storeroom contained the service which was shipped to the accused by the Bavaria Company following his complaints.

In his defense, accused asserted that he at no time received the delivery of the original shipment of china. Following his refusal to certify to the contrary on behalf of the express company, he discovered another set of the same pattern in his basement storeroom, the lock to which was defective. This event occurred on April 27, 1959, and he removed the china to his apartment. He became alarmed over the matter and on May 29, 1959, finally notified the Bavaria Company of his possession of both sets. Other evidence established that accused's letter setting forth this information was dated "29–59" and had been received by the Company on July 4, 1959.

Accused controverted the testimony of the criminal investigator concerning his admissions. He declared he had indeed informed the agent that he *now* possessed two sets of china, but that he could not understand how it happened. He intended to find out the particulars in the next few days.

The foregoing matters establish that the crucial question posed in this case is whether the accused knowingly received the initial shipment of china in January 1959, or whether he did not become aware of its presence in his basement storeroom until April 27, 1959, a date after he had complained and received the second delivery. Bearing this in mind, we turn to an examination of the court's participation in the trial proceedings.

A Specialist Ellison was called as a witness for the prosecution. He was apparently expected to testify that he had observed china from the initial consignment during January 1959, while residing with Sergeant Flagg and his wife. Such would have accorded with his pretrial statements. He nevertheless declared he was unable to recall whether he saw the china in Flagg's apartment in January or on some occasion after April 27. However, he believed it to have been in the latter part of April. His uncertainty was allegedly due to the many times he had visited the Flagg premises. Despite a claim of surprise, the law officer refused to permit the trial counsel to impeach Ellison's testimony.

Following cross-examination, members of the court took up the cudgels. After attempting personally to establish the date on which Ellison saw the

china, Colonel Irby, the president, concluded his initial questioning of the witness with the reminder that "you are testifying under oath." A member of the court, Major Spragins, asked the law officer whether Ellison's "sworn testimony taken by [the] CID" could be used "to refresh his memory." Subsequently, the trial counsel furnished the witness' pretrial statement to the law officer and that functionary laid the necessary foundation for its use. The witness then denied that it caused him to recall the date of his observation. The law officer then attempted unsuccessfully to qualify the pretrial statement as a memorandum of past recollection recorded.

Following further examination of the witness by counsel for both sides, the law officer interrogated Ellison concerning the reasons for the difference between his power of recollection at the trial and at the time he made the pretrial statement. Upon the conclusion of this examination, the president again renewed his questioning of the witness. He reminded Ellison once more that he was under oath and sought to ascertain why he tended to believe that he had not seen the china until the latter part of April. The tone of his interrogation is indicated by the following extract:

"Q. Specialist Ellison, I again remind you that you are under oath. Do you, of your personal knowledge, know the charge against Sergeant Flagg?
"A. Yes, sir, I've heard it.

"Q. All right, based on that charge, did you specifically pick the date—the last of April?
"A. No, sir.

"Q. Then why did you pick it? Why did you not pick a date such as the 15th of May or the 30th of May or the last of March?
"A. Based on the time that I was there more often, sir.

"Q. You stated, as I understood earlier, to the court that other than the time that you were visiting or at school at Vilseck, Germany, that you

visited Sergeant Flagg's quarters, I believe, once a month during April, May and June. Is that correct?
"A. I believe I said once a week, sir, on week ends when I had spare time.

"Q. All right, once a week.
"A. And for the weekend, sir.

"Q. Did you visit Sergeant Flagg's quarters more often prior to 1 May than you have since then?
"A. More often prior to 1 May? Well, lately I haven't visited him too often. I have been out in the field.

"Q. Answer my question.
"A. Have I visited more often before?

"Q. Before 1 May—
"A. Than since then?

"Q. —than since then? Yes.
"A. No, sir.

"Q. What is your religious belief, Specialist Ellison?
"A. Christian, sir."

A member of the court, Major Spragins, was the next officer to question Ellison. His interrogation inquired into the minute particulars of the various visits to Flagg's apartment and the manner in which the witness viewed the boxes of china. It was followed by that of another member of the court, Major Chapman, who examined the witness as closely as Major Spragins and concerning the same subject matter. The president resumed the questioning and sought even more details. Major Spragins next returned to the attack:

"Q. Are you interested in chinaware?
"A. Sir?

"Q. Are you interested in chinaware?
"A. No, sir.

"Q. You don't really think much about chinaware?
"A. No, sir.

"Q. And you were living in Sergeant Flagg's quarters during January and February. Did you normally eat in his quarters or outside?

"A. We would eat one meal or two meals there a day.

"Q. Since you have moved out of his quarters, how many meals a day do you eat there?

"A. Well, I remember eating one meal, I believe, for sure. I haven't been there. I haven't ate there as frequent as I did before, sir.

"Q. In other words, since the 1st of March—since the 1st of April, you have eaten one meal there. Isn't that what you said?

"A. I've ate one meal there, sir. Maybe I've eaten more.

"Q. And you are not interested in chinaware and you were a visitor in January and February and have eaten one meal since the 1st of February."

Finally, another court member, Captain Howard, joined his fellows. He also reminded the witness that he was under oath and sought again to establish the reason for the latter's belief that he had seen the boxes of china in the latter part of April. After Howard's questions had been answered, the witness was excused.

During the presentation of the defense case, the court members continued their extensive examination of the witnesses. The accused testified in his own behalf. Although extensively cross-examined by the trial counsel, the court members thought it necessary to undertake an equally lengthy inquisition. It was flavored with the same partisan cast. The accused's wife appeared as a defense witness, and the court members' examination of her knowledge extended to such quibbles as whether the door of her apartment opened to the left or to the right. Captain Howard sought to learn whether Mrs. Flagg in "the past two months or three months" had "ever been requested by a military or civilian agency to appear in a room with other ladies for a special purpose—a purpose for which you didn't know anything about?" In response to an inquiry by the law officer, the member asserted that the question was based upon testimony of other witnesses. When the law of-

ficer took issue with the statement, Howard admitted that there had been no such evidence.

During her testimony, Mrs. Flagg stated that she had employed a Mrs. Pope as a maid during the critical period. At the conclusion of the prosecution's case in rebuttal, Major Chapman asked that Mrs. Pope be located and called as a witness. After some discussion, the following colloquy occurred:

"MEMBER (Maj Chapman): As far as I am concerned, even if she is reasonably available, it's going to take a little time to get her testimony. I don't know how the rest of the court feels about wanting to hear from her or not.

"PRES: The statement is withdrawn from possible consideration.

"LO: Pardon me?

"PRES: The court does not desire that she be called.

"LO: Now, that's the president's thought. Now, the other members may, if they desire, have the witness called. Major, if you desire the witness called, we will obtain her.

"MEMBER (Maj Chapman): Sir, I don't think it's necessary."

There is no argument among the parties concerning the law to be applied in resolving the issue before us. Appellate counsel are agreed upon the proposition that the law officer or a member of the court may not depart from his impartial role in the trial in order to become a partisan advocate for either side. The question to be determined is simply whether the members of the court and the law officer were willing to accord fair consideration to all the evidence in the case or whether their participation in the proceedings establishes a propensity to convict, regardless of the matters presented. United States v Carver, 6 USCMA 258, 19 CMR 384; United States v Sears, 6 USCMA 661, 20 CMR 377; United States v Blankenship, 7 USCMA 328, 22 CMR 118; United States v Lynch, 9 USCMA 523, 26 CMR

**639**

303; United States v Lowe, 11 USCMA 515, 29 CMR 331. The Government argues, however, that this ■ "factual" issue was resolved against the accused by the board of review and thus not reviewable here. We immediately reject that contention, for it is clear that the bias of a judge or juror is a mixed question of law and fact, the decision on which we are empowered to re-examine.

Turning to the record before us, a convincing picture of a desire on the part of the court members ■ to assist the Government is presented. The same fault may be found with the law officer, albeit his participation was more limited. At the outset, we note few indications of partiality appeared until a prosecution witness seemingly recanted. Faced with evidence favorable to the accused's cause, the court industriously commenced to impeach the witness' credibility. The tone of their examination, so difficult to derive from the cold pages of an ordinary transcript of testimony, is indicated by the law officer's belief that the lengthy questioning of Ellison required an admonition against openly displaying bias. Having tasted the heady wine of advocacy, the court paid no heed to this entirely justified warning, but sought again to display their acumen by a telling cross-examination of the accused and the witnesses who appeared on his behalf.

The president's satisfaction with proof of accused's guilt is indicated by his attempt to prevent Major Chapman from hearing an additional witness. While the law officer took immediate action to correct this situation, we sense in the member's abrupt change of heart submission to superior military authority rather than sudden satisfaction with the proof adduced. See United States v Dean, 5 USCMA 44, 17 CMR 44. In short, this record establishes a determination on the part of the court to establish accused's guilt regardless of the evidence favorable to him. See United States v Blankenship, supra, concurring opinion of Judge Latimer, at page 335. Thus, it is clear beyond cavil that they departed from the role of impartial fact finders in order to join the Government as advocates of conviction.

In reaching this conclusion, we do not rely solely upon the number of questions asked by the law officer and court members. Similarly, the phrasing of particular questions is not of controlling significance. While these factors are important in determining the existence of bias, it is possible to conceive of extended interrogations designed only to elicit an understanding of obscure declarations or of unfortunately worded inquires, the effect of which is immediately overcome by the member's other clarifying actions. The record here depicts a contrary situation, and reversal is accordingly required.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

When court-martial members decide to try their hands at the art of cross-examination, they usually select the witnesses favorable to the defense as their victims. Very seldom do they make a full-scale assault on the testimony of prosecution witnesses. It may be that the testimony offered by the defense gives them a better field in which to display their skills, but it also makes it easier to conclude they are pseudo-prosecutors seeking to salvage a case for the Government. There were seven members of this court, and at least four of them actively joined with trial counsel in seeking to weaken the testimony of those who sought to aid the accused. Every person who has acted judicially on this record on appeal has commented on the excessive cross-examination by the court members so that it is fair to say they went way beyond the necessity of clarifying any doubtful areas. As a

matter of more than passing interest, the cross-examination went right to the heart of the credibility of the witnesses, and some of the questions were preceded by a veiled suggestion that before answering the witness should pause and reflect on the penalty of perjury.

I believe much of the trouble in this case was brought about by the law officer's misconception of the rights of court members. He knew they were skirting on dangerous territory, for even before they had completed their questioning of Specialist Ellison, which was prior to presentation of the defense case, he made the following observation:

> "I'd like to caution the court that the court should not take over the roll of either the prosecution or—now, the court hasn't but I think it—well, it's tending that way and I'd just like to caution the court on that."

He failed to follow up on his cautionary remark for thereafter, in answer to a question by the president of the court, he informed the members they could question the accused about any aspect of the case. That was an open invitation for a mass attack on the accused and the witnesses aiding him, and it was readily accepted. The Manual provides, in paragraph 54a, that "in a general court-martial, the examination by the court is ordinarily conducted by the law officer; thereafter, if necessary, members of the court may ask questions of the witness." With qualified counsel and a law officer on the court, there should be little necessity for the court members to assist either party. Their duty is to weigh the facts and judge the credibility of the witnesses and above all not to aid the Government by extensive cross-examination conducted for the purpose of cinching the guilt of the accused. Until law officers better control the avid desire of some court members to aid in the production of evidence, we are sure to be faced with records which reflect partisanship and not unbiased judgment. Human nature impels individuals to ferret out flaws in the testimony of witnesses, and once an untruth is suspected an inquisition follows. To avoid that consequence, a law officer must assert his authority and keep the trial in balance. He has means to deter the excessive zeal of court members and in this case that functionary failed to exercise his powers to protect the accused.

The board of review recognized that the court-martial members "overly extended" their cross-examination of the witnesses but found no prejudice. I disagree with that finding, for the crux of this case was the credibility of accused and other defense witnesses, and if they were believed, a crime had not been committed. It is incredible to believe the scales were in balance on that question when the examination by the members disclosed a dedicated purpose to prove the untrustworthiness of those who testified favorably to the accused. It is reasonably certain they were convinced that the testimony for the defense was fabricated and, by their own efforts, they confirmed their own convictions. No trial counsel was ever better aided and abetted by court members. To me prejudice is apparent in that setting, for court members are to judge, not prosecute, and if they assist the Government and aid in destroying the credibility of defense witnesses, they shed their robes as impartial triers of fact and substitute therefor the garb of advocacy. Certainly an accused is harmed when his guilt is ascertained by members who champion the cause of the prosecution.

For the foregoing reasons, I join with my brothers in reversing the findings and sentence.