UNITED STATES, Appellee

v

DAVID E. PRATT, Private First Class, U. S. Army, Appellant

15 USCMA 558, 36 CMR 56

*Captain Philip L. Robins* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Martin S. Drucker*, and *Captain Thomas E. Towe.*

*Captain Louren R. Wood* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins, Lieutenant Colonel Francis M. Cooper*, and *Captain John D. Jackson.*

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Presidio of San Francisco, California, upon a charge of desertion, in violation of Uniform Code of Military Justice, Article 85, 10 USC § 885, the accused pleaded guilty to the lesser included offense of absence without leave, in violation of Code, supra, Article 86, 10 USC § 886. He was found guilty of desertion, and sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for one year, and reduction.[1] Intermediate appellate authorities affirmed, and we granted accused's petition for review upon the assigned error that:

"EXAMINATION OF THE APPELLANT BY MEMBERS OF THE COURT INDICATE THAT THEY DEPARTED THEIR ROLE OF BEING FAIR AND IMPARTIAL FINDERS OF FACT AND ASSUMED THE ROLE OF A PROSECUTOR TO THE PREJUDICE OF THE ACCUSED."

The evidence, as well as accused's provident and voluntary plea of guilty, indicates he absented himself without leave at Youngstown, Ohio, on September 19, 1963, and was apprehended by agents of the Federal Bureau of Investigation on January 8, 1965. At the time of his apprehension, accused denied his identity, claimed he was one "David Diamond," displayed various means of identification to that effect, and declared he had been discharged from the service in early 1964. Asked for his service number, he gave one the same as his genuine number, except for the last two digits. When the Federal agents nevertheless took him into custody, accused admitted his true name and stated, " 'I'm a deserter.' "

In a pretrial statement obtained from him after compliance with Code, supra, Article 31, accused acknowledged his absence without leave and noted it was motivated by a large number of debts. He lost his identification card prior to absenting himself and threw away his dog tags after arriving in California. He left his uniforms in a friend's apartment. Obtaining a Social Security card in the name of "Diamond," he worked during his absence for three different firms, and travelled throughout California, the Middle West, and Florida. His false name was assumed in order to avoid apprehension.

Two of accused's employers testified he had worked for them under the name of "Diamond." One indicated accused's application was for permanent employment and that it stated he had previously served with the Army for three years.

For the defense, it was shown accused had been awarded several excellent ratings and one good rating for conduct and efficiency. Testifying in his own behalf, accused conceded his absence without leave, but denied any intent to remain absent permanently. His absence was motivated by his debts and

---

[1] In a subsequent action on the case, the Secretary of the Army changed the characterization of the adjudged dishonorable discharge to a bad-conduct discharge.

inability to get along with his fellow soldiers. He stated he was afraid to surrender in view of the consequences which he knew would follow but was relieved when he was finally apprehended. When it was shown that his lost identification card had been replaced prior to his absence, Pratt declared he had also mislaid the new one. He denied throwing away his dog tags, stating that he had lost both them and his uniforms.

With the evidence in this posture, certain of the court members undertook to examine the accused in the following manner:

"Questions by Lt Colonel Allen:

"Q How far did you go in school?
"A High school, sir.

"Q You graduated from high school?
"A Yes, sir.

"Q Did you attend the same school for four years?
"A No, sir.

"Q Well, when you say that in conversation with your fellow soldiers you would get them deeper involved than they wanted to be, how do you mean this—you were referring to your interest in the arts and classics?
"A Well, I have made it a point to read a lot and I have learned many things by reading, and they would bring up a subject and we would start talking about it, and I might know a little more about it than they would and get above them—they'd get in over their heads; they'd resent me at the time, I was a know-it-all, that's what I was, trying to be a know-it-all, when I was just trying to pass on something I knew.

"Q Well, then, during your stay at Fort Benning, you still continued to study and . . .
"A Yes, sir.

"Q . . . and further your education? What was the type of literature you studied?
"A I took a course in human biology, sir.

"Q Was that the only extension course you took over there?

"A No, sir.

"Q I'm curious as to why you wear your jump qualification wings up over the right pocket.
"A That's where they put them, sir.

"Q Who put them?
"A Over at the stockade, sir.

"I asked . . . I had been out— you realize I have been gone 16 months and I even had trouble remembering which way to turn my brass, and I asked some of them where they went.

"Q And yet you can remember the classics and in discussion with your fellow soldiers get them in deeper than they want to be with you—and in a matter of 16 months you have forgotten which side to put the brass on?
"A These are the things I'm interested in, sir.

"Q Well, I thought you were interested enough in the military as a career to apply for O.C.S.
"A Yes, sir.

"Q Well, a military career has to start somewhere, and it stops somewhere. Just where do your interests deviate from what other members of your group consisted of as far as military interests?
"A As far as military interests, sir?

"Q Well, you say the things you remember are the things you like.
"A Yes, sir.

"Q Well, what makes you think there aren't still subject matters as an officer, assuming you finish Officers Candidate School, that would still be of the same nature?
"A I know there would be a matter of that nature in there, sir.

"LT COL ALLEN: I have no further questions.

"Questions by Lt Colonel Jackson:

"Q Private Pratt, you have stated that on your application to Sterling Dental Service that, aside from the fact you did indicate the name was David Diamond, that everything else

was correct on the application, is that true?

"A Everything except 'U. S. Army, 3 years,' sir.

"Q All right then, everything else is correct on the application?

"A Yes, sir.

"Q Well, on the application you answered here: 'Temporary or permanent employment'—you put down 'Permanent'—I must assume that is your statement. You also said you would return to the Army. Just when would you return?

"A Sir, when you're making application for salesman, it's always best to make it permanent even if you intend to stay part-time. I knew I wasn't going to be there permanently.

"Q Although you had a choice of 'temporary or permanent employment' in your answer?

"A Yes, sir.

"Q Then this is not a correct statement on your application?

"A Basically no, sir.

"LT COL JACKSON: I have no further questions.

"Questions by Major Taylor:

"Q Private Pratt, why did you throw away your dog tags if you intended returning to service?

"A Sir, when I said I threw away my dog tags, I was tired, I was hungry, I was in a hurry, I wanted to get it over with, when actually I lost them; I kept them in my pocket on a chain—I had some keys on it. As time went on I lost them. When I first went to San Francisco I had my identification as David Pratt in the back of my wallet, which I also lost, just about three months after I had left.

"Q When did you lose your identification card, your military ID card?

"A I lost that at Fort Benning, sir.

"Q That was lost at Fort Benning; had you applied for a new ID at that post?

"A No, sir, I lost it just the day I went on leave, prior to going on leave.

"Q Did you feel you would need or require that ID card on leave to properly identify yourself as a member of the military?

"A I went to the company commander and asked him, sir; he said, 'You can apply when you get back.'

"Q Was this the only means of identification as military you had when you went on leave at your home?

"A Leave papers, Class A pass, dog tags.

"Q Now did you lose your ID card or was it thrown away or misplaced at Fort Benning?

"A Oh, I lost it, sir.

"Q You lost it; do you recall the circumstances you might have lost it?

"A No, I don't, sir.

"Q All right, what did you do with your uniform when you arrived out here in California?

"A I took it off and changed into civilian clothes in the apartment I was staying in.

"Q Here in San Francisco?

"A Yes, sir.

"Q And you left the uniform in the apartment?

"A Yes, sir.

"Q Was this the apartment of a friend of yours?

"A Yes, sir.

"Q And what happened to that uniform after you took it off there and put on civilian clothes?

"A Well, he was . . . he was stricken by a heart attack and he was sent home and the place was locked up. I was staying there and paying him so much every day.

"Q Had you ever seen the uniform in that period of time after you took it off?

"A No, sir, I have never seen the uniform . . .

"Q You have never seen the uniform since?

"A No, sir.

"MAJ TAYLOR: No other questions.

"Questions by Captain Heriot:

"Q When you reported to your company commander that you had lost your ID card, did you go ahead and apply for one before you went on leave?

"A No, sir.

"Q And at what stage—you say you applied for O.C.S.?

"A Yes, sir.

"Q —what stage was that application turned down? When I say 'stage,'—by the corps commander, battalion . . .

"A I applied for security clearance, and I had so many papers in quadruplicate and everything else—they wanted to know where I lived ever since I was born, everything; I couldn't recall all this. I took it back to them and asked if all this was necessary, they kept saying it was; I'd write home and try to find out from my mother where we had been all these years and how long we were there, when we left and everything, and I couldn't get any definite answer, and he kept telling me my security clearance was going to be held up, it wasn't going to go through like that.

"Q So you never did get the personal history form turned in with the application, is that right?

"A No, sir.

"CAPT HERIOT: I have no further questions.

"Further questions by Lt Colonel Allen:

"Q Did you ever actually apply, then, for O.C.S.?

"A I put in a 10–49, sir.

"Q Well, a 10–49 is a personnel action, can cover anything; did you actually put in a request that you be considered for Officers Candidate School?

"A Yes, sir, I did.

"Q On a 10–49?

"A Yes, sir.

"Q What were the reasons for wanting to be an officer that you put on the 10–49?

"A I originally came into the Army with all intentions of making it a career.

"Q You had to include a statement, then, on the 10–49 as to the reason why you thought you were qualified to be an officer. What was that reason you put on the 10–49?

"A I didn't put that on the 10–49.

"Q But it's part of the requirement in applying for OCS that you have to put on the form . . .

"LO: I think we're getting into matters far afield from this case—let's move on to something else if you will."

Both the Government and the accused are in agreement with respect to the law applicable to the issue before us. See United States v Carver, 6 USCMA 258, 19 CMR 384; United States v Blankenship, 7 USCMA 328, 22 CMR 118; United States v Flagg, 11 USCMA 636, 29 CMR 452; and United States v Marshall, 12 USCMA 117, 30 CMR 117. Thus, as we have many times held, court members are entitled to examine witnesses before them, including the accused, but, in so acting, they must not depart from their role as impartial arbiters of guilt or innocence and become partisan advocates for either side. Here, the parties are only in disagreement as to whether the court members abandoned their proper parts and demonstrated, by their questions of the accused, "a propensity to convict, regardless of the matters presented." United States v Flagg, supra, at page 639.

We believe the examination of the accused, quoted supra, convincingly establishes the members' advocacy of the prosecution's cause and their determination to destroy any effect of the accused's denial of an intent to desert—weak as it might be—in the eyes of those fact finders who wisely elected not to enter into the controversy and to judge the case as presented by competent counsel for both sides. As we noted of the record in United States v Flagg, supra, at page 640:

". . . Faced with evidence favorable to the accused's cause, the court industriously commenced to impeach the witness' credibility . . . [and] sought . . . to display their acumen by a telling cross-examination of the accused. . . ."

The improper questioning commenced with Lieutenant Colonel Allen, who cast considerable doubt upon accused's credibility by artfully developing his intelligent interest in nonmilitary matters and then pointing out that he "in a matter of 16 months" had forgotten the proper position for wearing his paratrooper wings. Moreover, viewed in perspective, every question asked by this member seems designed to establish Pratt had no interest in the military and, hence, inferentially, never intended to return to the Army.

Lieutenant Colonel Jackson's examination is even more revealing. Having set a trap for the accused by getting his agreement that every entry on an employment application was true except that relating to his alleged prior military service, he sprang it triumphantly by referring to the fact accused had applied for " 'Permanent' " employment and was, therefore, either intending to desert or was lying when he made out the application. Such cleverness may play its proper part in a television melodrama, but it has no place in the supposedly clarifying examination of an impartial court member. See United States v Flagg; United States v Marshall, both supra.

Major Taylor then joined the attack. His cross-examination, admittedly more innocuous than the preceding examples, nevertheless searchingly inquired into the circumstances surrounding the loss of accused's identification card and uniforms, once more matters which bore heavily upon the question of his intent, which, in view of the plea and evidence, was the only real issue in the case. And, after he had concluded his cross-examination, Lieutenant Colonel Allen returned to the field with an argumentative examination designed to demonstrate conclusively that the accused was unworthy of credit and lacked the desire to return to the military which he had professed on direct examination.

Thus, as in United States v Marshall, supra, "we have no trouble in visualizing the attitude of at least some of the members of this court-martial. In short, these proceedings convincingly demonstrate that these members assumed the role of 'pseudo-prosecutors seeking to salvage a case for the Government.' Concurring opinion of Judge Latimer, United States v Flagg, supra, at page 640." We reiterate our frequently expressed statement that an accused is entitled to have his case soberly considered by impartial court members, whose duty is to judge his guilt rather than join the prosecutor's effort to discredit any claim of innocence which the defense may throw forward. United States v Marshall, United States v Blankenship, both supra. The accused here did not receive that sort of a hearing on the charge of desertion and he was, accordingly, prejudiced. The risk of harm to his interests, however, does not extend to the lesser included offense of absence without leave to which he providently pleaded guilty. We grant relief, therefore, only as to the findings of guilty of the major offense.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Army. The board may affirm findings of guilty of absence without leave and reassess the sentence, or it may order a rehearing.

Chief Judge QUINN and Judge KILDAY concur.