UNITED STATES, Appellee

v

LADINE DOTSON, Airman, U. S. Air Force, Appellant

21 USCMA 79, 44 CMR 133

No. 24,080

November 26, 1971

Lieutenánt Colonel Norman L. Paul argued the cause for Appellant, Accused. With him on the brief was Colonel Bertram Jacobson.

Captain Bruce D. Viles argued the cause for Appellee, United States. With him on the brief were Colonel Henry R. Lockington, Colonel James M. Bumgarner, and Lieutenant Colonel Robert W. Vayda.

## Opinion of the Court

FERGUSON, Senior Judge:

The accused was convicted under Article 128, Uniform Code of Military Justice, 10 USC § 928, on August 20, 1970, of one specification of assault upon Linda Fields by cutting her on the chest, abdomen, and right hand with a means likely to produce grievous bodily harm—a knife. She was sentenced to a bad-conduct discharge, forfeitures of $50.00 a month for four months, confinement at hard labor for a like period, and reduction to the grade of Airman Basic. The convening authority approved the findings and sentence but suspended the bad-conduct discharge until August 15, 1971, with provision for automatic remission. The Court of Military Review affirmed the findings and sentence. We granted review to consider the following issue:

Whether the president of the court abandoned his role as an impartial trier of the facts, as evidenced by the nature and extent of

his questioning of the witnesses, including the accused.

A short resumé of the facts is necessary to place the granted issue in proper perspective.

The principal individuals involved in the events leading up to the assault are Dolores Watson, Linda Fields, and the accused, all female members of the Air Force, stationed at McChord Air Force Base, Washington. In the late afternoon of June 20, 1970, Watson and Fields became involved in an argument resulting in Watson receiving a cut on the chin, from either a fall or the use of a knife,[1] which required medical treatment. When the accused learned of the injury to her friend Watson, she secured a steak knife and sought out Fields "to beat her up. . . . Because she had cut Dolores." The accused took the knife with her "[b]ecause they said she [Fields] had one." When Fields saw the accused coming toward her barracks, she ran inside and picked up a bottle "[f]rom off the television in barracks 752 in the dayroom. . . . Just in case she was coming after me." They met in the hallway of the barracks and in the ensuing struggle Fields received cuts on her chest, abdomen, and hand. She was unaware of being injured until afterwards. The accused testified that she took the knife out of her pocket when she saw Fields "coming down the hall at me with a bottle." She denied that she deliberately cut the victim but on cross-examination replied "I guess so" when asked whether she "actually anticipated perhaps using it [the knife]."

There is no disagreement as to the law applicable to the question before us. Both sides agree that ██ a member or members of the court may not, while exercising their right to question witnesses, become advocates or partisans for either side. United States v Blankenship, 7 USCMA 328, 22 CMR

118 (1956); United States v Flagg, 11 USCMA 636, 29 CMR 452 (1960); United States v Marshall, 12 USCMA 117, 30 CMR 117 (1961); United States v Pratt, 15 USCMA 558, 36 CMR 56 (1965). Cf. paragraph 149b (3), Manual for Courts-Martial, United States, 1969 (Revised edition). Appellate defense counsel contend that the president, in this case, overstepped those bounds to the prejudice of the accused. Appellate Government counsel, while acknowledging that "the president, as well as the other court members, may have asked too many questions, many of which were injudiciously phrased, often times completely irrelevant, immaterial and inconsequential," maintain that "none of the inquiries demonstrates anything more than an effort on their part to clarify matters in evidence and to obtain additional information relevant to the charge."

The matter did not escape the attention of the staff judge advocate for he informed the convening authority in the post-trial review:

"IX. ERRORS AND IRREGULARITIES.

"a. The most prominent irregularity in the record of trial is the extensive questioning of witnesses (including the accused) by members of the court, predominately by the president, Colonel Mamlock. In fact, Colonel Mamlock asked a total of 374 questions of the witnesses, according to my count. This is an extraordinary number of questions, and reflects a zeal on his part that appeared to become dangerously partisan on several occasions.

• • • • •

"Taken in toto, however, the questions by Colonel Mamlock were not so partisan as to demonstrate that he had abandoned his position as an impartial trier of fact and become an advocate. . . ."

---

[1] On the basis of legal advice, Fields, who was then under court-martial charges involving the fight with Watson, declined to talk at this trial about whether she had a knife during the altercation with Watson.

The record of trial reflects that the president of the court asked in excess of 425 questions (Government brief says approximately 450) of the witnesses, of which about ninety were asked of the accused before findings. While the extent of the inquiry by members of the court is not controlling (cf. United States v Kemp, 13 USCMA 89, 32 CMR 89 (1962)), it is an important factor to be considered in determining the existence of bias. United States v Flagg, supra. As this Court said in United States v Erb, 12 USCMA 524, 533, 534, 31 CMR 110 (1961):

> ". . . It is not the number of the questions, but the fact of partisanship that is the fundamental issue in an allegation of this kind. In other words, did the president act as an impartial fact finder or did he take on the mantle of a Government advocate? United States v Blankenship, 7 USCMA 328, 22 CMR 118 [1956]; United States v Carver, 6 USCMA 258, 19 CMR 384 [1955]."

And in United States v Brown, 13 USCMA 485, 489, 33 CMR 17 (1963):

> ". . . [M]embers of courts-martial must, at all times, keep a fair and impartial attitude. They may not, by their questions, become advocates or partisans for either side. Unbiased judgment must be maintained; excessive zeal and inquisitions cannot be countenanced. [Extensive citations omitted.]"

At the outset of the trial, the military judge informed the court members of their right to question the witnesses "in order to clarify your view of the evidence." He told them that since their questions "are subject to objection by either side on proper grounds, . . . I would appreciate your posing such questions to me so that I, or at my direction, the trial counsel, may put the question in proper form." *This procedure was never followed.* Immediately upon completion of the examination of the first witness, the victim Fields, the president of the court questioned her directly concerning certain aspects of her testimony. He also directly interrogated nine of the remaining eleven Government witnesses. Other court members joined in the questioning to the extent that only one Government witness escaped their personal probing. The testimony of each of the defense witnesses was similarly scrutinized by the president and court members, with major attention being given to that of the accused.

When the defense rested, the court recalled and questioned the victim Fields and two other Government witnesses, as well as a witness who had been identified during the trial proceedings as being present during the altercation but was never called. At the direction of the military judge, this latter witness was treated as a Government witness. As a result of these proceedings, defense counsel found it necessary to reopen his case and to again question four witnesses who had previously testified for the Government. The prosecution recalled only the newly found witness who was originally called to testify by the court. Each of the witnesses called and recalled by the court were extensively questioned by the president and the members.

In our opinion, the record of trial reflects that the president of this court abandoned his role as an impartial trier of the facts to the prejudice of the accused (United States v Flagg, United States v Blankenship, United States v Marshall, and United States v Pratt, all supra) as evidenced by the following:

1. In questioning witnesses Height, Anderson, and Tautges, the president inquired whether they had detected the presence of alcohol on the breath of the accused. Of the latter, he asked:

> "Had you consumed any alcohol, marijuana, speed, or anything that might have turned you on during that day?"

No evidence of this nature was ever placed before the court by trial or defense counsel or by any of the witnesses. Although the replies in each instance were negative, the specter of the possible use of alcohol and drugs by the accused was improperly injected into the case.

2. On one occasion, he asked a witness whether the accused had originally resisted apprehension and, on another, whether she was violent or caused any disturbance while in confinement, despite the fact that such potential uncharged misconduct had never been raised by the Government.

3. He questioned the accused concerning the ownership of the knife, eliciting from her that it was not her knife and that she did not know who owned it, thereby raising the implication that she unlawfully possessed it at that time.

4. Without any basis in the record, the president inquired of the accused whether she owned or had ever owned a switchblade knife.

5. He attempted to impeach the accused by requesting her to explain the difference between her testimony and that of another witness and then remarked, "To me it is obvious that somebody is not telling the truth."

6. In three instances he questioned the rulings of the military judge:

a. The military judge sustained an objection to the testimony that the accused had related "it wouldn't make any difference" if she got into further trouble "because she had already been busted [demoted] anyway." When the military judge instructed the court to disregard the remark, the president asked for and received an explanation for the ruling. Colonel Mamlock's assertion that he still did not understand the procedure prompted defense counsel to withdraw his objection to the question. This controversy led to a disclosure by defense counsel that the accused had received Article 15, Code, supra, 10 USC § 815, punishment on one occasion for failure to go to her appointed place of duty. Defense counsel contended that he felt obliged to enter this record *on the merits of the case* in order to avoid any thinking by the court that her previous difficulty "was for something disorderly or having anything to do with temper or assault." When the accused testified under oath, on sentence, the president questioned her extensively about this infraction. When she replied in the affirmative, in answer to a direct question that this was the first time she had failed to repair or meet her schedule, the following colloquy occurred:

"Q [President] Is it normal that your supervisor or the commander of the squadron would prefer charges against you on the first occasion that you had failed to repair?

"MJ Sir, I think it's a little unfair, I would object to that question, you would have to ask that witness what it was normal for him to do as far as customariness.

"Pres I will rephrase the question.

"Q Have you ever been warned by a supervisor that you have either failed to report to work or have been late to work? Previous to this day that the Article 15 reflected?
"A I might have been late but I got there.

"Q Had you ever been warned before for being late?
"A Yes.

"Q On this occasion that you got the Article 15 for, you failed to repair. Did you report at all during that time period you were supposed to have been on duty?
"A No sir.

"Q You just did not appear, is that correct?
"A No sir.

"Q But you had previously been late, this is correct?
"A Yes sir."

Trial counsel, in his argument on sentence referred to this offense and the court's questions about it. He argued, "By the defendant's own testimony, this really wasn't the first time. This was recognition of a demonstrated lack of potential."

b. The military judge sustained a defense objection to a question on cross-examination on the ground that it was beyond the scope of the original testimony. When the military judge again sustained the objection, after trial counsel argued that his inquiry was an attempt to show interest and bias on the part of the witness, the president questioned the ruling and the military judge found it necessary to explain his action.

c. Evidence was presented with regard to the type of pretrial confinement to which the accused was subjected. Just prior to argument on sentence, the following controversy took place:

"Pres The court has a question, Your Honor. The court is not satisfied with the answers that have been given regarding the maximum confinement of the accused. We would like to delve into it a little more thoroughly regarding the confinement of Airman Dotson.

"MJ Sir, I am going to deny your request. This portion of the trial has to do with matters that should be concerned, with matters that concern an appropriate sentence. What the defense was doing here was presenting evidence of pretrial restraint, in other words, punishment in effect that has already been imposed, and this proceeding is not an appropriate time for an investigation into that confinement, that pretrial confinement that was imposed in this case. I think from what defense has presented that it is clear to the court that it was of a rather rigorous nature and has been for an extended period of time.

"I just feel that what effect it could have on sentence has been completely developed with respect to this issue, and if there are any doubts in the court's minds with respect to this evidence, those doubts should be resolved in favor of the accused, Airman Dotson.

"Pres Your Honor, my point is there is question in my mind, and I believe the court's mind, regarding whether or not it was a rigorous, as you stated, confinement. I am not convinced that it was a rigorous confinement, or it wasn't a rigorous confinement. I have nothing to base an opinion on, whether it was or not.

"IC Your Honor, I think there was sufficient evidence from a person who has been in the confinement field for 13 years as to his opinion as to whether or not it was rigorous. I think that is sufficient.

"MJ Again, sir, I am going to deny the request of the court, and I point that your determination and decision should be based on the evidence that was presented. As defense counsel has pointed out, we have testimony from a person who has been in that business for 13 years, his opinion was submitted. If there is still doubt in the court's mind with respect to this, any doubt should be resolved in favor of the accused, Airman Dotson.

"Pres Your Honor, the point is this one person who rendered his opinion had no experience with cases of this nature, specifical[l]y confinement of a WAF.

"MJ Sir, the court can consider this in judging or determining what value should be given his opinion, if they desire, but I am going to deny the request from the court for any further evidence with respect to the pretrial confinement.

"Member of the court (Maj McClurg): Would this include any further examination of the justification for the extension of the maximum custody. This is not established, what the justification was.

**83**

"MJ The justification for the custody status is, in my opinion, not really in issue here. What is important is the status that was in fact imposed.

"Member of the court (Maj McClurg): It was told by the sergeant that this was somewhat in excess of the normal maximum custody and my question was if there was any justification for this, and if not, then it would constitute greater punishment than would normally be expected.

"MJ That is the point that defense was trying to make and I feel presented considerable evidence on in presenting the confinement facility NCOIC, but once again, I feel that the justification for a particular custody status is not in issue. What is important and at issue here is what punishment in effect, or what pretrial confinement had been in fact imposed, and I feel this was adequately covered by the witnesses present, so I am going to deny the request of Major McClurg also.

"The court is now ready to hear argument."

In short, the record is clear that the president of this court clearly demonstrated his lack of impartiality as evidenced by his attempts to develop areas of other misconduct by the accused not charged; his efforts to argue with the military judge over rulings apparently adverse to the Government and to impeach the accused; and his refusal to accept testimony favorable to the accused with regard to her confinement prior to trial. In each of the incidents cited above, the president attempted to enter areas not previously developed by the Government.

We feel sure that Colonel Mamlock entered upon his duties as a court member with a firm conviction to hear the evidence impartially and to render a just verdict. Unfortunately, his zeal drove him to the point where a reasonable person reading merely the cold pages of the record would be forced to the conclusion " 'that . . . (he) departed from his character as an unbiased appraiser of facts to become a champion' for the prosecution (United States v Carver, 6 USCMA 258, 265, 19 CMR 384 [1955])." United States v Blankenship, supra, at page 334.

The decision of the Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge DARDEN and Judge QUINN concur.